**WILLOW FARM PRODUCTS CO. et al. v. BRANNAN, Secretary of Agriculture.**

No. 49C759.

United States District Court
N. D. Illinois, E. D.

Feb. 8, 1950.

Arthur R. Seelig, Chicago, Illinois, for plaintiffs.

Otto Kerner, Jr., U. S. Atty., Chicago, Ill., for defendant.

IGOE, District Judge.

## Nature of Action and Issues Involved

This action is brought by the plaintiffs under Title 7, U.S.C.A. § 608c(15) (b), section 8c(15) (b) of the Act of May 12, 1933, 48 Stat. 31, as amended May 9, 1934, 48 Stat. 675, as further amended August 24, 1935, 49 Stat. 750, and as re-enacted and amended by the Agricultural Marketing Agreement Act of May 12, 1937 [June 3, 1937], 50 Stat. 246, which said Act of May 12, 1933 as reenacted and amended, hereafter referred to as the "Act," vests the several District Courts of the United States with jurisdiction to review any ruling of the Secretary of Agriculture of the United States, upon the petition of any handler filed pursuant to Title 7, U.S.C.A. § 608c (15) (a), being section 8c(15) (a) of the Act.

The issue involved is whether the Ruling of the Secretary of Agriculture of the United States issued April 14, 1949, is or is not in accordance with law. The Ruling dismissed the petition of the plaintiffs as a milk handler under Order 41 as amended for the Chicago Milk Marketing Area. The plaintiffs' petition claimed that the actions of the Market Administrator for the Chicago Milk Marketing Area, in disallowing for the months of January through November, 1946, the utilization of all milk used for butter and condensed milk production in the use and price classifications reported by the plaintiffs with the result that the Market Administrator debited plaintiffs' account with him in a total of approximately $33,500.00, were arbitrary, capricious and contrary to law.

## Findings of Fact

The Court Finds That:

(1) The plaintiff, Willow Farm Products Co., is a corporation of the State of Illinois, operating a dairy plant at LaGrange, Cook County, Illinois, in the Northern District of Illinois, Eastern Division of this Court. For about thirty years the Polivka family operated the dairy under the name of Willow Farm Products, a copartnership. The corporation, made up of the Polivka family, has succeeded to all of the assets and operations of the partnership, and is the real party in interest.

(2) On February 17, 1947, the partners then doing business as Willow Farm Products, filed their petition under section 8c (15) (a) of the said Act with the Secretary of Agriculture of the United States of America, asking relief from the interpretation and enforcement by the Market Administrator for the Chicago, Illinois, Milk Marketing Area of Order No. 41, as

amended, regulating the handling of milk in the said Chicago milk marketing area. The Department filed an answer to such petition. A hearing was had, extensive oral evidence submitted, and numerous exhibits were also introduced. The hearing officer of such Department issued a report concluding that all of the actions of the Market Administrator were in accordance with law, and recommended an order dismissing the petition. Exceptions were filed and argued orally by the plaintiff. On April 14, 1949, the Department by and through its "Judicial Officer" issued its "Preliminary Statement, Findings of Fact, Conclusions and Order" of said date, hereinafter referred to as the "Ruling," denying the relief requested by the plaintiff and dismissing the petition.

Within twenty days after the date of said ruling plaintiff filed its complaint for review in this cause. The Department of Agriculture has transmitted to this Court, and the same are part of the files in this case which were before the Court and considered by the Court, said petition filed by the plaintiffs, the Answer of the Department of Agriculture, the stenographic report of the testimony submitted in the administrative hearing, the exhibits introduced, the Presiding Officer's Report and Recommended Order, the briefs filed, the exceptions to the Presiding Officer's Report and Recommended Order, and the Ruling by the judicial officer dated April 14, 1949 from which this review proceeding is taken.

(3) The provisions of Order No. 41 as amended, effective July 1, 1941, in force during the period in question, and primarily involved in this proceeding, are:

"Sec. 941.3 *Reports of handlers.* * * * (b) *Verification of Reports and Payments.* The market administrator shall verify all reports and payments of each handler by audit of such handler's records, and of the records of any other handler or person upon whose disposition of milk such handler claims classification. Each handler shall keep adequate records of receipts and utilization of milk and shall, during the usual hours of business, make available to the market administrator or his representa-tive such records and facilities as will enable the market administrator to:

"(1) Verify the receipts and disposition of all milk required to be reported pursuant to this section, and, in case of errors or omissions, ascertain the correct figures; * * *.

"Sec. 941.4 *Classification of Milk.* (a) *Basis of Classification.* All milk purchased or received by a handler from producers, associations of producers, and other handlers, including milk produced by him, if any, and including milk or cream purchased or received from sources other than producers or handlers, shall be reported by the handler in the classes set forth in paragraph (b) of this section; * * *.

"(b) *Classes of Utilization.* Subject to the conditions set forth in paragraph (a) of this section, the classes of utilization of milk shall be as follows:

"(1) Class 1 milk shall be all milk disposed of in the form of fluid milk, excluding bulk milk disposed of to bakeries, soup companies, and candy manufacturing establishments, but including bulk milk disposed of to hotels, restaurants, and other retail food establishments, and all milk not accounted for as Class II milk, Class III milk or Class IV milk. * * *

"(c) *Responsibility of Handlers in Establishing the \Classification of Milk.* In establishing the classification of milk as required in paragraph (b) of this section, the responsibilities of handlers in establishing the classification of milk received by them shall be as follows:

"(1) In establishing the classification of any milk received by a handler from producers, the burden rests upon the handler who receives the milk from producers to account for the milk and to prove to the market administrator that such milk should not be classified as Class I milk."

(4) The Order was further amended September 1, 1946, but admittedly no substantial changes were made. The only relevant change made was that paragraph 941.4(c) above, was changed to read as follows: "(c) Responsibility of Handlers. In establishing classification the responsibility of handlers shall be as follows: Any

milk received from producers shall be classified as Class I milk unless the handler who receives such milk directly from producers *proves to the satisfaction of the market administrator* that such milk should be classified in another class without regard to whether such milk has been used **or** disposed of (whether in original or other form) by such handler, by any other handler(s), or by any unapproved plants(s)." (Italics supplied.) (Admittedly the record keeping and classification provisions of the Order remained the same from September 1, 1939, throughout the entire period in question.)

(5) During the months of January through November, 1946, inclusive, and for many years prior thereto, the plaintiff operated a dairy plant at LaGrange, Illinois, where it received milk from producers, and on occasions from other handlers and from other sources, and processed and bottled the milk for sale upon its own routes and by other means of sale and distribution, and separated milk into skimmed milk and cream and butter, manufactured other milk products, and during portions of the period involved, manufactured condensed milk containing 8% butterfat, and condensed skimmed milk containing 1% butterfat. The plaintiff dairy purchased all of the milk produced by its producers, and accordingly it had substantial quantities of surplus milk, particularly during certain seasons of the year, and that therefore its consistent procedure over the years had been to absorb this surplus in the manufactured products indicated. Plaintiffs testified that during the period in question, approximately 166,000 pounds of butter were churned, and substantial quantities of condensed skimmed milk panned. (The remaining manufactured product involved in this case was an item called "Cream Cheese Spread". It appears that only one small order involving a relatively negligible quantity of butterfat was made. On argument before this Court, counsel for the plaintiff asked that this product be excluded from the relief requested for the reason that this being a special and isolated order, the procedure followed in that one instance was not typical nor determinative of the general procedure, habitually followed in the case of butter and condensed milk and condensed skimmed milk.)

(6) The original Order No. 41 became effective September 1, 1939. Then the plaintiff dairy was not selling milk within the area defined by the Order and was not subject to its terms. On July 1, 1940, the Chicago Marketing Area was amended to include Oak Park, Illinois. The plaintiff dairy was then selling milk in Oak Park and, consequently, became a "handler" under the terms of the Order. Shortly thereafter a conference was had with the plaintiffs at the Market Administrator's office, as to the manner in which plaintiff was to report milk used for the manufacture of butter. At that time both grades "A" and "B" milk were handled at the dairy plant and as a result of this conference it was agreed that the Market Administrator's office would allow milk used in the manufacture of butter to be computed on a so-called "residual" or "balancing-out" basis, i. e., the volume of milk shown by the plaintiff's records as having been sold in Class I and Class II was deducted from the total volume of all milk handled, and the balance was accepted as having been used in Class IV. This procedure was followed until Order No. 69 became effective on September 1, 1944, which Order No. 69 regulated the handling of milk in the suburban territory near Chicago, not covered by Order No. 41, and included certain additional territories in which plaintiff was then disposing of milk and milk products. The Market Administrator, after the effective date of Order No. 69, refused to accept reports accounting for milk used for butter production on the residual or balancing-out basis as above. The Department introduced evidence to show that Howard Kramer, chief auditor for the Market Administrator, notified the plaintiff that since the advent of Order No. 69, the previous acceptance of reports showing milk used for butter manufacture computed on a residual basis was over, and that if the plant continued to receive grade "B" milk from another plant, all of the operations of the plaintiff plant would be considered as coming under Order No. 41 as amended. The

Market Administrator thereafter disallowed the quantity of milk shown as having been used in the production of butter on a residual or balancing-out method, but voluntarily adopted the procedure of allowing to the plaintiff the quantity of milk used in butter manufactured, as shown by the weight of such butter in monthly reports then currently being furnished by the plaintiff to the Office of Price Administration. The Market Administrator from October, 1944, through the month of December, 1945, immediately preceding the period in question, in auditing the monthly utilization reports of the plaintiff, determined the quantity of milk and butter fat used in butter manufacture, by multiplying the butter yield, as shown by such OPA Reports, times the conversion factor of 80.85%. The record shows agreement by both sides that the use of the formula of actual yield times 80.85% is a very accurate method of determining the butterfat equivalent of a known weight of butter containing not less than 80% butterfat. Illinois law requires that butter contain not less than 80% butterfat.

(7) During the months of December, 1945, and January, 1946, certain conversations took place between Howard Kramer, chief auditor for the Market Administrator, and the plaintiff, concerning the keeping of records of manufactured products. The record is confusing and contradictory as to what specifically was discussed and said. Not only is the context of these conversations denied by the plaintiffs, but there is much conflict in the testimony, if the Market Administrator's witnesses alone are considered. Of all of the Market Administrator's representatives only Mr. Kramer suggested the necessity of keeping *daily* inventory records. Neither Slavicek, Piehl, Evans, Marquardt or Hitchner of the Market Administrator's office, nor Mr. Colebank, the Market Administrator himself, made any reference whatsoever to a requirement for the keeping of a daily inventory. Mr. Kramer's testimony conflicts with that of the Market Administrator's auditor Piehl's testimony that he had reviewed and examined the plaintiff's records in detail during the period in question, and

had found no irregularities or discrepancies of any kind. (R. 479,480,514.)

(8) The Market Administrator on or about January 21, 1946, sent a letter to the plaintiff dairy, which letter is in the record as Exhibit 17. This letter is as follows:

"We wish to call your attention to that part of Order No. 41 fixing the responsibility of handlers in establishing the classification of milk which reads as follows: 'In establishing the classification of any milk received by a handler from producers, the burden rests upon the handler who receives the milk from producers to account for the milk and to prove to the market administrator that such milk should not be classified as Class I milk.'

"Our auditors find that your record of butter production is not satisfactory to prove your claim of butter produced each month, and under the circumstances we will have to apply the above section and classify the milk equivalent of butter claimed as Class I."

No further letter or communication of any kind was ever sent by the Market Administrator to the plaintiff.

(9) Commencing with the month of January, 1946, being the first month of the period in question, and for each month involved herein, the plaintiffs, believing themselves to then be in full compliance with the conversations had with the Market Administrator's representatives, and with the Market Administrator's letter of January 21, 1946, improved their record-keeping practices by, for the first time, keeping a full and complete opening and closing monthly inventory of all milk products. They further improved their reporting procedure in that they discontinued reporting milk used for butter on a residual or balancing-out method, and for the first time reported milk used for butter production on the basis of the actual weight or yield thereof, times the conversion factor of 80.85%, in the same manner as was then currently being used by the market administrator, as above. Exhibits 16 and 18 to 27 are sheets showing the yield of the butter churn by month and by individual days, indicating the production in pounds. The

uncontradicted record is that all milk going into the butter churn was weighed and tested; that the weight of the butter coming from the churn was determined as it was removed from the churn; that the production sheets such as exhibits 16 and 18 to 27 were prepared at the time the butter was produced. The plaintiffs kept extensive books and records. The plaintiffs had a complete set of books and made available to the Market Administrator's office all original and secondary records of receipts and utilization of milk, such as records of receipts from its farmer producers and others, all original drivers' route books, all daily order slips of its drivers, and of the independent distributors to whom it sold, all sales records, storage records, cancelled checks and check stubs, bank statements, inventories, records of butter yield, records of condensed and condensed skimmed milk production, as well as numerous other types of records. The Market Administrator's auditor Piehl testified that he examined these records and found them to be in good order, and that no discrepancies were indicated. The original report of the presiding officer at the administrative hearing, paragraph 10, page 19 thereof states: "There is no dispute in this proceeding concerning the adequacy of the books and records of the petitioner to show the intake of milk at the plant." The uncontradicted record is that the books and records of the plaintiff dairy indicated all of the transactions of the dairy. The Market Administrator testified that in this case there is no question of dishonesty (R. 59), nor is there any question as to the correctness of the plaintiff's records, but only as to the sufficiency thereof (R. 50). Francis S. Spachman, an independent dairy accountant, testified that he had examined and analyzed the records of the plaintiff, had found they were susceptible of verification, that he had verified the same, and found that the reports of receipts and utilization of milk were supported by their records within acceptable dairy accounting standards. (Similarly, the testimony of auditor Piehl of the Market Administrator's office, as shown above.) (R. 487 to 489.) Howard Kramer, chief audi-

tor of the Market Administrator's office, testified that dairy accounting, at best, does not require absolute precision, and that there is always some loss in a dairy plant. (The Order itself permits a loss of 2% butterfat.) All records kept by the plaintiff dairy were made available to the Market Administrator's office.

(10) Procedure on condensed milk and condensed skimmed milk manufacture was similar to that of butter. Introduced in evidence are production sheets or cards showing in each instance, the date, the gross weight, tare weight, and net weight of the product. The uncontradicted record is that in every instance the necessary preliminary tests and calculations were made to determine that the finished product would have a minimum butterfat content of 1% or 8%, as required. The weight of the items going into the condensing pan was determined upon a calculation previously made as to the amount of milk which the tanks would hold. The butterfat test of skim or whole milk was taken, and additional butterfat in the form of butter, cream or whole milk was added, bringing up the test to the level required, for a correct butterfat test in the finished product.

(11) The Market Administrator, solely because of his mistaken impression that the plaintiff failed to keep a record of the weight of butter churned or opening and closing monthly inventories and failed to preserve a record of the weight and butterfat test of the milk going into the butter churn, and the products going into the condensed milk pan, took the position that he was not obliged to proceed further in any attempt to verify plaintiff's utilization reports. The Administrator made no attempt to verify the utilization reports by checking or tying in with all of the other records of the plaintiff dairy, nor with the records of other handlers (as required by section 941.3(b).

(12) On February 25, and again on April 22, 1946, during the period here involved, the plaintiff received certain audit adjustments from the Market Administrator, relating to two monthly delivery periods shortly prior to the period in question. These audit adjustments contained a part

thereof identified as "explanation of audit adjustment" in which the Market Administrator in disallowing the quantity of milk which the plaintiff had reported as having been used in butter production stated: "Reported butterfat to butter as a balancing figure; audit allows only actual production or yield, times 80.85% after October 1, 1944." These exhibits 2 and 3 indicate the adoption by the Market Administrator during the period in question, of accounting for butterfat used for butter manufacture on the basis of yield times the butterfat conversion factor above. This same method of using the actual yield as shown by the butter production records, exhibits 16 and 18 to 27, times the identical conversion factor was denied to the plaintiffs during the same period. During the period from October, 1944, through December 1945, when the Market Administrator voluntarily adopted the procedure of accounting for butterfat as used for butter manufacture on the basis of production as shown by the plaintiff's OPA reports times the conversion factor, the butter production and inventory records of the plaintiff were not as complete as during the period in question, and, hence, were not as susceptible of verification.

(13) Although the Market Administrator knew, or should have known, according to his own testimony, within a relatively short time after January 1, 1946, that audit adjustments would be made disallowing butterfat used for butter production and classifying milk reported as Class IV to Class I, resulting in the imposing of substantial charges or debits in the plaintiff's account, nevertheless, he sent no notice thereof of any kind to the plaintiff. The first audit adjustment which the plaintiff had, indicating such disallowance, was not until November 26, 1946, at the very end of the period in question, thereby making it impossible for the plaintiff to minimize its losses. The audit adjustment reclassifying all milk from Classes III and IV to Class I, amounted to a charge of approximately $33,500.00 most of which amount has already been collected from the plaintiff by the Market Administrator from sums otherwise payable to the plaintiff from the

Market Administrator, out of the Producer's Settlement Fund. (The Producer's Settlement Fund is a fund created under the Order for the purpose of equalizing payments by handlers, inasmuch as handlers are required to pay to their producers a uniform blended price in spite of the manner in which the milk is actually used by them.)

(14) The Market Administrator did not personally make the determination that the plaintiff's records, kept and made available, were inadequate for purposes of verification. Section 941.3(b) above, provides that the Market Administrator shall verify the reports of receipts and disposition of each handler. The Market Administrator admitted that it was his responsibility to personally determine whether the records of a handler are susceptible of verification (R. 17, 21, 25, 40). He admitted, however, that he was not qualified to personally determine what is a satisfactory set of books for verification (R. 38). The Market Administrator's testimony shows that he had no clear conception of his obligation to verify handler's records, nor what "verification" entailed. In spite of the provisions of section 941.3(b) of the Order, which provided that verification shall be made on the basis of *all the records* of the handler and even of the records of *other handlers,* it is apparent that the disallowance in the present case was made solely because one detail, which the Market Administrator thought was needed, was not available. No effort was made to verify by an examination of all of the handler's records, and no effort made to verify by examination of the records of other handlers. The Market Administrator admitted that the determination was that of Mr. Kramer of his office. He testified: "I am saying that I am not an accountant and I do not know specifically what records are adequate." (R. 25.)

(15) Although section 941.3(b) of the Order provides only that a handler shall keep "adequate" records of receipts and utilization of milk without further interpretation, and although section 941.4(c) provides that all milk received by a handler "shall be classified as Class I milk unless the handler * * * *proves to the satisfaction of the*

*Market Administrator* that such milk should be classified in another class * * *," the Market Administrator admitted that he was not qualified to make such determination. He testified: "I am not qualified to say what is a satisfactory set of books for verification." (R. 38). Also: "We have no standards with respect to the form of records that the handlers may keep." (R. 40). The Market Administrator's testimony as shown at pages 30 to 40 of the Record, show that he had established no standard as to what constituted adequate records for verification.

(16) The Market Administrator published no rules, regulations, or standards of any kind as to the type, nature, or extent of records to be kept by a handler, nor any interpretation of the record-keeping requirements of section 941.3(b) of the Order. The only statement of the nature of the records to be kept is contained in section 941.3(b) of the Order, which provides that each handler shall keep "adequate records" of receipts and utilization of milk. No delegation of authority to make such determination was made from the Market Administrator to Mr. Kramer, or any other person in his office, and such delegation, if made, would undoubtedly have been unlawful.

(17) Section 941.4(e) (6) of the Order specifically provides that the total pounds of milk in Class IV shall be determined in the following manner: "Multiply the actual weight of each of the several items of Class IV milk by its average butterfat test;" continuing, this same section provides: "Determine the difference in pounds of butterfat contained in inventories at the beginning and end of the delivery period." (Section 941.1 entitled "Definitions," subparagraph (i), is as follows: "Delivery period means the current marketing period from the first to the last day of each month both inclusive." The entire concept and terminology of the Order is on the basis of a monthly rather than a daily period, and there is no reference anywhere in the Order to daily inventories, the requirement for which was testified to by Mr. Kramer alone.)

(18) Findings 6, 7 and 9 of the Ruling relating to conversations between the Market Administrator's representatives and the plaintiff dairy, and purported "warnings" as to the necessity for keeping certain types of records appear in many instances to contradict the record. Even if such contradiction did not exist, such findings are consistent only with the judicial officer's improper interpretation of the verification requirements of the Market Administrator, and his apparent belief that any failure in having a determinable standard of compliance could be corrected by mere oral warnings or conversations. If it is found, as this Court does find, that the Market Administrator improperly interpreted and administered sections 941.3 and 941.4, and had no determinable standard of compliance, so that a dairy might determine in advance what records were required to be kept by it, such conversations have no significance in determining the issues of this proceeding. (It may be noted that the purported refusal of the dairy to keep certain additional records, which was denied by the plaintiff, was in response to the improper request by Mr. Kramer that *daily* inventories be kept.)

(19). Finding 10 of the Ruling that: "The disallowances were made because the reported utilization of milk in the named products could not be verified from petitioner's records," is not supported by the Record, and is not supported by a correct interpretation of the Market Administrator's obligations of verification, or the record-keeping requirements of the Order. This Court has found as a fact that the records were verified by accountant Spachman. Also the testimony of auditor Piehl of the Market Administrator's office. The record shows that the Market Administrator did not attempt to verify.

(20) Findings 11(a) and 15 of the Ruling that the plaintiff kept no *daily* inventory records and did not keep certain other specific types of records therein enumerated, whether supported by the record or not, is immaterial since the Order does not require the keeping of such records, nor was any lawful ruling or interpretation made, or rules published by the Market

Administrator which could properly require the keeping of such records. The fact that the judicial officer made such findings shows that he fell in line with the erroneous interpretation and enforcement of the verification and record-keeping sections of the Order, which had been pursued by the Market Administrator.

(21) Finding 11(b) of the Ruling, as to purported variation in the record yields of condensed skim and condensed milk, are not supported by a correct interpretation of the record, and a careful examination of the exhibits 29 and 39, covering the two months there in question. These exhibits were prepared and computed on a *monthly* basis, and if examined on that basis, it is found that the variation was minute and well within permissible dairy standards. If computed on the improper *daily* basis, of course there would be variations occasioned by uneven amounts having been left in the condensing pan for the next pan operation. The exhibits in question specifically indicate that many of the pan operations were started with remnants of the last pan operation. The finding referred to by the judicial officer in the Ruling entirely disregards these figures contained in the exhibits numbered above.

(22) Finding 12(a) is contrary to the uncontradicted record. The butter produced was periodically checked as to its butterfat content, and the laws of the State of Illinois require that all butter must contain a minimum of not less than 80% butterfat.

(23) Finding 14 that the Market Administrator made the disallowance after lengthy discussions with the accountants of his office, is of no significance and does not contradict Mr. Colebank's own testimony that he personally did not make such determination. Conversations between the Market Administrator and his subordinates are not in the record, would be inadmissible and are not binding upon the plaintiff.

(24) The Administrative Procedure Act of the United States, 60 Stat. 237, 5 U.S. C.A., § 1001 et seq., and specifically section 3(a) thereof, provides that:

"Every agency [of the United States] shall separately state and currently publish in the Federal Register:

"(1) * * *; and (3) substantive rules adopted as authorized by law * * * or interpretations formulated and adopted by the agency for the guidance of the public,

* * *. No person shall in any manner be required to resort to organization or procedure not so published."

## Conclusions of Law

The Court Makes the Following Conclusions of Law:

The Ruling of the Department and the actions of the Market Administrator upon which such Ruling rests, purportedly interpreting and enforcing the provisions of Order No. 41, as amended, are contrary to law and illegal, in the following regards:

(a) Since section 941.3(b) of the Order, as amended, relating to the "Verification of Reports and Payments" requires each handler to keep and make available to the Market Administrator "adequate" records of receipts and utilization of milk, without defining what records are adequate and without setting up or establishing a determinable standard as to what records must be kept, and section 941.4(c) of the Order, as amended, relating to "Responsibility of Handlers in establishing the classification of milk" states that the handler shall have the burden to prove to the Market Administrator's satisfaction that milk received by a handler should be classified in a classification other than as Class I milk, without setting forth any standard by which the nature or extent of such required proof can be determined, the Department or the Market Administrator, in order to lawfully administer and enforce the Order, were compelled to, but did not, establish, publish, declare and enforce a fixed and determinable standard of compliance as to what constituted a proper and adequate set of records to verify the handlers' utilization reports and to prove the use of milk in its respective price classifications, to the satisfaction of the Market Administrator.

(b) The interpretation and enforcement by the Market Administrator of sections 941.3(b) and 941.4(b) (1) and (c) above, in the manner done, without determining, publishing or enforcing a reasonable and determinable standard of compliance as to what records were required is contrary to law and constitutes the taking of property from a handler without due process of law, since the two sections, construed together, provide that all milk shall be considered as having been used in Class I or for fluid purposes, unless the handler has sufficient records of receipts and utilization to prove to the satisfaction of the Market Administrator that it was used in a lower price classification, without containing any wording from which a determinable standard of compliance as to the nature and extent of required records can be determined, and without any language from which the degree of proof which must be submitted to the Market Administrator can be determined. There is no other provision in the Order which amplifies or explains these sections.

(c) Although section 941.3(b) of the Order merely provided that *adequate* records of receipts and utilization should be kept, and section 941.4(c) puts the burden on the handler to prove usage in the respective use and price classifications to the satisfaction of the Market Administrator, the Market Administrator had no actual standard of compliance as to what constituted an adequate set of records for verification purposes. He admitted his inability and lack of qualifications to determine what constituted such a standard. (R. 40, 38.)

(d) Neither the Department nor the Market Administrator established, and the Market Administrator did not enforce a reasonable or determinable standard of compliance whereby the plaintiff, or any other handler under the Order could determine what records were required or could determine by any methods required by law whether it was or was not complying with the record-keeping requirements of the Order.

(e) Although the record-keeping requirements of the Order remained unchanged from 1939 and throughout the period in question, the Market Administrator adopted and used a number of varying methods to determine butterfat used for manufactured products in Classes II, III and IV, i. e., the Market Administrator first permitted all milk used in Class IV for the manufacture of butter to be computed on a mere residual or balancing-out basis, as being all milk not reported as having been used in Classes I, II and III. From 1944 until the beginning of the period in question, the Market Administrator chose to compute butterfat used for butter manufacture on the basis of the quantities shown in the plaintiff's reports to the Office of Price Administration, times the conversion factor of 80.85%. During the period in question, the Market Administrator disallowed such production computed on the last of the foregoing methods, although during the period in question audit adjustments, as shown by exhibits 2 and 3 were made by the Market Administrator, in which he continued to use such method himself. The use of such varying standards voluntarily by the Market Administrator indicates that the Market Administrator had no fixed or determinable standard of compliance as to what constituted correct records of manufactured production and demonstrates the necessity for the determination and publication of a uniform standard of compliance. (The plaintiff has not attempted to invoke the doctrine of estoppel against the Market Administrator, but rather, has argued as shown, that his use during and immediately preceding the period in question of determining the quantity of milk used for butter manufacture, on the basis of yield times the conversion factor, indicates that the Market Administrator had no uniform standard of compliance and that the use of this procedure by the plaintiff was proper.)

(f) Although neither the Department nor the Market Administrator published or declared a uniform standard of compliance as to what constituted adequate records, the Market Administrator, nevertheless, failed to take into consideration the specific and peculiar operations and processes of the plaintiff dairy. He made no attempt to correlate the extensive records of the vari-

ous departments and activities of the plaintiff dairy in its entirety to determine if such records adequately accounted for all milk (Section 941.4(b) (1) and proved its usage (Section 941.4(c).

(g) Neither Howard Kramer, chief auditor, nor anyone else subordinate to the Market Administrator, had any authority to establish a standard of compliance as to what constituted a proper set of records, of milk receipts and utilization, under sections 941.3 and 941.4 of the Order. The Market Administrator admittedly had the personal responsibility of determining such standard and of thereafter personally making the decision as to whether or not the handler had met such standard. (Colebank's testimony, R. 17, 21, 25, 40.)

(h) There is no requirement of the Order that a handler keep *daily* inventory records or any other records on a daily basis. The entire concept of the Order is based on a *monthly* delivery period, and all records are to be kept on a monthly basis. Such requirement for *daily* inventory records cannot be interpolated into the Order merely by the oral request of Kramer, chief auditor. (It may be noted that neither the Market Administrator nor any other accountant from his office, at any time mentioned the necessity for daily inventory records. Section 941.4(e) (6), relating specifically to the manner in which Class IV production shall be computed, provides that it shall be on the basis of actual yield times the butterfat content (the conversion factor) and reconciled with inventories at the beginning and end of the "delivery period." Section 941.1 of the Order provides that the delivery period is in every instance the calendar month.)

(i) The deficiency of a proper and determinable uniform standard as to what records must be kept by a handler under the Order, could not be cured by mere instructions, conversations or "warnings" with or from Mr. Kramer or others of the Market Administrator's office. The standard as to what records must be kept by a handler can lawfully be set only by the Act, the Order and by rules or regulations lawfully issued. The testimony of Mr. Kramer

and other accountants of the Market Administrator's office, which at best is very conflicting, does not make their concept of customary or usual record-keeping procedure a validly enforcible part of the Order.

(j) Although section 941.3(b) of the Order placed upon the Market Administrator the admitted responsibility for him to personally determine if the records of handlers were adequate to verify the handlers' reports of utilization (R. 21, 25, 40), the Market Administrator improperly interpreted his responsibility under such section, and did not personally make such determination, but relied upon the determination by subordinates in his office who had no authority to make such determination.

The record clearly shows that the Market Administrator relied not only upon his subordinates for evidentiary facts and figures, but relied entirely upon their conclusions and determinations.

(k) The Market Administrator misconceived his obligations of verification under section 941.3(b) of the Order and arbitrarily refused to try to balance or verify the extensive records of the plaintiff. Although such section requires that verification shall be made by audit of all records of the handler and even "the records of any other handler or person upon whose disposition of milk such handler claims classification," and although he knew that the plaintiff had extensive records reflecting all its operations, and although audits and investigations by his office had admittedly shown no errors or irregularities, the Market Administrator improperly relying upon Mr. Kramer's determination that the records were inadequate because of his request for *daily* inventories, etc., and also upon his own mistaken impression that the plaintiff kept no production or inventory records (R. 19), refused to even try to verify the plaintiff's records. The Market Administrator testified that he "assumed" that the process of verification always had to be done by the same records used in preparing the monthly utilization reports (R. 36), but his chief auditor, Kramer, more correctly disagreed in testifying that verification usually implies "the employment of a different checking system, rather

than a mere routine repetition of the original process" (R. 396). The Market Administrator looked for perfection, whereas only a reasonably complete set of records is necessary for verification, as a missing detail can be verified by checking with other available records. The testimony of the Market Administrator's auditor, Piehl (R. 488, 489), and the accountant, Spachman (R. 616), is that they had checked the reports of utilization with the various records of the plaintiff and that no discrepancies or irregularities appeared. Mr. Kramer testified that in dairy practice absolute accuracy is impossible and only reasonable accuracy is required (R. 397, 401). In a case such as this where the Market Administrator agrees that no question of dishonesty is involved (R. 59), and there is no question of the correctness but only of the sufficiency of the records (R. 50), and where manufactured products involved were admittedly produced, it is apparent that the actions of the Market Administrator showed an improper interpretation of his obligations of verification under section 941.3(b) of the Order.

■ (1) The refusal and failure of the Market Administrator to attempt or try to verify or check all of the records of receipts and utilization of the plaintiff dairy was arbitrary and capricious, in the light of the extensive records kept by the plaintiffs, and particularly in the light of the testimony of Mr. Piehl of his department, that the records were susceptible of verification; the testimony of accountant Spachman to the same effect; and the requirements of section 941.4 of the Order itself, providing that verification shall be made on the basis of all records of the handler and even of the records of other handlers.

■ (m) In the absence of a definite standard as to required records to constitute proof of use to the Market Administrator under section 941.4(c), a handler discharges his burden or obligation of substantiating his utilization reports by keeping and making available to the Market Administrator, *reasonable* records. The plaintiff's records of receipts and utilization of milk, including records of butter and condensed milk and condensed skimmed milk production, when considered together with all other records, were adequate for purposes of verification in the absence of a definite, lawful designation of the records which a handler would be required to keep in order to account for the usage of such milk in Classes II, III and IV, under section 941.4(b) (1) of the Order, and such milk should not have been classified by the Market Administrator as Class I milk. The plaintiff had fully discharged its burden or obligation of accounting for all milk used in Classes II, III and IV.

(n) The plaintiff, starting with the period in question, improved its record-keeping procedure in that for the first time monthly inventories were kept of all products and monthly utilization reports to the Market Administrator were reported on the basis of actual yield, as shown by production records. On the basis of their interpretation of the Market Administrator's letter of January 21, 1946, exhibit 17, and the audit adjustments received from the Market Administrator during the period in question (being exhibits 2 and 3, wherein the Market Administrator adopted the procedure of allowing milk used for butter manufacture on the basis of actual yield times the conversion factor of 80.-85%), the plaintiff thought that it was then complying with the Order in full, and, in the absence of any lawful requirement for records of a type not kept, the plaintiff reasonably discharged its obligations under the Order. (Mr. Kramer's testimony [R. 92], that the words "butter production" as used in the Market Administrator's letter, exhibit 17, meant "butter manufactured" supports the interpretation given to the letter by the plaintiff upon which they based their revised reporting procedure and negatives the testimony of the Market Administrator that it should mean the details of the commodities going *into* the butter churn.)

(o) The action of the Market Administrator in classifying all milk as Class I, manifestly contradicts the actual facts, inasmuch as the dairy over a period of thirty years had consistently churned butter, and admittedly churned large quantities of but-

ter and did pan large quantities of condensed milk and condensed skimmed milk during the period in question. The action of the Market Administrator, in the absence of any element indicating fraud or dishonesty, and in the absence of any specific designation of records, is arbitrary and capricious. The plaintiff, by its utilization reports accounted for the use of all milk, and there was no unaccounted for milk which could lawfully be reclassed as Class I milk (section 941.4(b) (I). By keeping reasonable records to substantiate such utilization reports in the absence of any lawful requirement for specific types of records, it made sufficient proof available to the Market Administrator to discharge its obligations under section 941.4(c). The Market Administrator under such circumstances could not in effect say that all milk received by the plaintiff had been sold as fluid milk and that no butter or condensed milk had been manufactured. (The Market Administrator testified that the fluid milk equivalent of the 166,000 pounds of butter churned was about 5,500,000 pounds (R. 54), an amount which the plaintiff dairy could not conceivably have absorbed in its fluid milk output (R. 247).

■ (p) The interpretation and enforcement of the Order in the manner done by reclassifying all milk reported as having been used for manufactured purposes in use and price Classes III and IV, to fluid milk Class I, solely on the basis of the claimed insufficiency of records, notwithstanding the fact that the Market Administrator admittedly had and published no standard of compliance as to what constituted adequate records to prove use classification, contradicts the actual fact of usage and violates the purposes of the Agricultural Marketing Agreement Act of 1937, as amended, and particularly section 608c (5) (A) thereof, which provides that milk may only be classified according to the form in which it is used.

(q) The failure of the Department and the Market Administrator to issue a ruling or regulation as to what constituted a proper set of records for the proof of utilization and verification purposes, is in violation of section 3(a) of the Administrative Procedure Act of the United States, 60 Stat. 237, requiring that all agencies of the United States shall issue and publish rules or regulations for the guidance of persons dealing with such agency. Section 608c (7) (c) (ii) of the Agricultural Marketing Agreement Act provides that the agency selected to carry out the purposes of the Act, shall include "the powers: * * * (ii) To make rules and regulations to effectuate the terms and provisions of such order."

(r) Although the Market Administrator was admittedly advised by his accountants that audit adjustments would be made denying Class III and Class IV reported utilization as early as the months of March or April, 1946, nevertheless, he did not notify the plaintiff of any such audit adjustment until November 26, 1946. A delay in making such audit adjustment or in at least suitably notifying the plaintiff, made it impossible for the plaintiff to minimize its loss.

(s) The Market Administrator's actions were contrary to law and he improperly interpreted and sought to enforce the terms and purposes of the Act and of Order No. 41, as amended, and particularly sections 941.3 and 941.4 thereof.

(t) The "Conclusions of Law" set forth in the Ruling are not in accordance with law, in that they proceed upon incorrect legal theories as to what constitutes correct standards of compliance, determinable standards of records to be kept by a handler, the obligations of the Market Administrator to verify the records of handlers, and the limitation of the burden placed upon a handler to discharge his obligation in establishing milk usage in the various price classifications, and in other regards. If the record in this case, and particularly the testimony of the Market Administrator himself is considered in the light of correct legal theories concerning the foregoing, the conclusions of the Ruling cannot be supported and are shown to be contrary to law. The Court so concludes.

Therefore, on the basis of the above Findings of Fact and Conclusions of Law,

it is hereby ordered, adjudged, and decreed by the Court as follows:

1. That the ruling dated April 14, 1949, of the Department of Agriculture, from which this complaint for review proceeds, is hereby corrected, altered, reversed and modified in accordance with the further terms and provisions of this Decree.

2. The prayer of the petition originally filed before the Department of Agriculture pursuant to section 8c (15) (a) of the Act, and of the complaint filed in this Court, be and the same is hereby allowed. Such portion thereof, however, as relates to milk used for the production of the one order of Cream Cheese Spread, is hereby disallowed. (This disallowance is in accordance with the request and agreement by the plaintiff upon the trial of this cause before the Court.)

3. All milk during the period in question, shown upon the monthly utilization reports of the handler as having been used in Classes III and IV for the production of butter, condensed milk and condensed skimmed milk, and thereafter classified as Class I, pursuant to audit adjustments made by the Market Administrator, as shown by the record herein, shall be permitted to stand as Class III and Class IV usage, as shown by such monthly utilization reports.

4. All amounts charged by the Market Administrator against the plaintiff for the reclassification of milk from Classes III and IV to Class I herein, totaling approximately Thirty Three Thousand, Five Hundred ($33,500.00) Dollars, shall be cancelled, and all amounts collected by the Market Administrator from the plaintiff or the predecessor partnership, shall be paid and returned by the Market Administrator for the Chicago Milk Marketing Area to the plaintiff, Willow Farm Products Co., an Illinois corporation, which the Court finds to be the party in interest in this cause.

5. The Secretary of Agriculture and the Department of Agriculture of the United States, and the Market Administrator for the Chicago Milk Marketing Area, and their respective offices, agents, and officers, shall do and perform any and all acts required to carry out and give full and complete effect to this Decree.

6. The Court shall and does retain jurisdiction of this cause, to carry out and enforce this Decree.

7. The plaintiff shall have such other, different and further relief as the carrying out and giving effect to this decree may require.