SUNNYDALE FARMS, INC., Plaintiff,

v.

Orville FREEMAN, Secretary of Agriculture, Defendant.

Civ. 20356.

United States District Court
E. D. New York.

Jan. 29, 1963.

Harry Polikoff, New York City, for plaintiff.

Joseph P. Hoey, U. S. Atty., Eastern Dist. of New York, for defendant; Stanley F. Meltzer, Asst. U. S. Atty., of counsel.

BARTELS, District Judge.

This is a proceeding under Section 8c (15) (B) of the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. § 608(c) (15) (B), to review a ruling of the Judicial Officer of the Department of Agriculture, requiring plaintiff, as a handler of milk, to account and pay for certain alleged milk to the Market Administrator under Federal Order No. 27, promulgated by the Secretary of Agriculture under said Act and regulating the handling of milk in the New York metropolitan area.[1]

Under Section 608(c) (15) (A) of said Act, a handler objecting to the ruling of the Market Administrator or of the Department must file a petition for review thereof before the Department. The Judicial Officer of the Department of Agriculture (sometimes referred to as the "Officer") having denied plaintiff's petition, plaintiff now seeks review of such denial pursuant to the above Section 8(c) (15) (B).[2] A motion for summary judgment was filed by the defendant, whereupon the plaintiff filed its cross-motion for summary judgment.

Under Order No. 27, as amended, 7 C.F.R. 927,[3] regulating the handling of milk in the New York-New Jersey marketing area, all milk handlers are required to pay minimum prices to farmers for milk purchased. In order to determine whether all such milk was paid for at the minimum prices, the Market Administrator under Order No. 27 and the Regulations issued thereunder is required to verify the receipts and utilization of milk received by the handler from the farmer. Milk is received and paid for in terms of pounds but is disposed of in terms of quarts. To balance disposition of milk with receipts, the amount disposed of must be converted into pounds. If in the process of converting quarts into pounds it becomes apparent that the milk handler has disposed of more milk than he has received, then a question is raised as to the source of the excess and whether upon an accounting any funds are due for such excess.

1. The general scheme of milk regulation and compensatory payments under the Act are fully outlined in Lehigh Valley Cooperative Farmers, Inc. v. United States, 1962, 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345. The scheme provides, among other things, for uniform prices to be paid by milk handlers to producers regardless of the ultimate utilization of the milk. Adjustments among handlers are made by way of a "Producer Settlement Fund", into which each handler contributes the excess of the "use value" over the uniform price to the fund. Adjustments are then made among handlers based upon the actual utilization value of the milk purchased.

2. Sunnydale Farms, Inc., 18 A.D. 1246 (1959).

3. The general reorganization of Chapter IX of the Code of Federal Regulations has resulted in redesignation of most of the milk marketing orders. The New York-New Jersey Marketing Order which had been previously designated as Milk Marketing Order No. 27, 7 C.F.R. Part 927, is now designated as Order No. 2, 7 C.F.R. Part 1002. Since the administrative record and the decision of the Judicial Officer were made prior to the reorganization, the section references and the contents of the regulations as quoted are as they were in effect during the period involved.

If records of the specific weights of milk disposed of are kept by the handler, no difficulty arises. If he does not produce such specific weights upon an accounting, then a conversion factor must be employed. To provide for such a case the Market Administrator included in the Rules and Regulations Section 927.231 to the effect that "in the absence of specific weights", milk in a quart unit shall be deemed to weigh 2.15 pounds.

In reviewing the legality of the Secretary's action we must bear in mind the limitation upon the Court's power to review the findings of administrative agencies including milk marketing agencies. If the Secretary's ruling is supported by substantial evidence and is otherwise legal, it cannot be disturbed. Ogden Dairy Co. v. Wickard, 7 Cir., 1946, 157 F.2d 445; New York State Guernsey Breeders Co-op. v. Wickard, 2 Cir., 1944, 141 F.2d 805, 153 A.L.R. 1165. The crux of the case is whether there was substantial evidence to justify the finding of the Judicial Officer [4] that the milk handler had failed to supply specific weights, which in turn authorized the Judicial Officer to apply Sections 927.231 and 927.79 of the Rules and Regulations issued under Order No. 27 requiring the application of the conversion factor of 2.15 pounds per quart of milk in determining the amount of milk disposed of and also the payment for any excess so determined as a payment for milk for which the farm source was not established.

## FACTS

Plaintiff is a milk handler in Brooklyn engaged in the business of buying milk from farmers and others and pasteurizing, processing and packaging same for distribution to consumers and others. Plaintiff is subject to Federal Order No. 27, promulgated by the Secretary of Agriculture, under which is prescribed the minimum prices paid by handlers to farmers upon milk subject to said Order (7 U.S.C. § 608c). As prescribed by the Order, the Market Administrator audited plaintiff's records for the purpose of verifying the receipts and utilization of milk at plaintiff's Brooklyn plant as reported by it for the months of September, 1956 through February, 1957.

The audit showed that plaintiff's records disclosed the amount of milk received at its plant in pounds and the amount of milk disposed of in quarts, pints, half pints and one-third pints. To reconcile disposition of the milk with the receipts of the milk, the Market Administrator applied the conversion factor of 2.15 pounds per quart as specified in Section 927.231 of the Classification and Accounting Rules under Order No. 27. The use of this conversion factor resulted in more pounds of milk as having been disposed of by plaintiff than were shown by the records as having been received by it. The Market Administrator accordingly billed plaintiff for the amount of $8,859.32 for payment into the Producer Settlement Fund pursuant to the provisions of Sections 927.143 and 927.79 of the Rules and Regulations under Order No. 27 on the ground that the excess milk must be treated as having been received in the form of milk from an "undisclosed source".

Plaintiff claims that the application of this conversion factor was unjustified because it had produced reasonable evidence of specific weights which showed that its quart units weighed not more than 2.125 pounds. Plaintiff further argues, among other things, that the application of the conversion factor of 2.15 pounds per quart resulted in a theoretical or paper excess in pounds of milk to be accounted for, and that the Market Administrator treated the paper excess as milk from an "undisclosed source", whereas Section 927.79 of the Order is applicable only to milk "for which the

---

4. The Judicial Officer acted as and for the Secretary of Agriculture pursuant to authority delegated to the Judicial Officer. 10 F.R. 13769; 11 F.R. 177A–233; 18 F.R. 3219, 3648; 19 F.R. 74. Also, see Flavin, The Functions of the Judicial Officers, U.S.D.A., 26 G.W.Law Review 277.

farm source is not established" and not to milk whose source, as in this case, had been established by the handler's records.

The pertinent portion of Section 927.231 of the Rules and Regulations includes the following:

"Sec. 927.231. Weights.
In the absence of specific weights the following table shall be used:

| Product | Unit | Net Weight lbs. |
|---------|------|-----------------|
| Cream (16% bf) | 40 quarts or 40-quart can | 85.42 |
| | * * * * * * | |
| Milk | 40-quart can | 85.00 |
| Milk (packaged) | Quart (in any package) | 2.15" |

From this section it is obvious that the 2.15 pounds per quart standard comes into play only in the absence of specific weights. It is incumbent, therefore, upon the plaintiff to come forward and produce the specific weights if it wishes to stay the operation of the conversion factor. Plaintiff claims it has produced this evidence by (a) certain records for 84 of the 152 operating days which show the weights of quarts dispensed during that period by three machines, (i) American Canco Filling Machine (Canco), (ii) Sealking No. 1 machine, and (iii) Sealking No. 2 machine; (b) oral testimony as to the accuracy of the operation of the above machines after the valves of the same were properly set in relation to a calibrated quart, and (c) oral testimony that similar records were kept for the remaining 68 days but thereafter lost. The Judicial Officer indicated that this evidence was insufficient because (1) records for 68 days were missing, (2) the records which were kept for the 84 days showed that pints measured on one of the Sealking machines were not in adjustment with the quart measurement, and (3) the Canco machine could become maladjusted.

## MACHINES

Plaintiff's plant, in addition to facilities for bottling milk in glass, has three machines for packaging milk in paper, a Canco machine and two Sealking machines. The Canco machine packages only quarts in preformed containers and consists of 18 valves, each packaging a quart. The two Sealking machines, on the other hand, form the paper containers and each machine has two sides containing four valves, each valve dispensing a half pint, a quart being thus filled after being run under the four valves. Evidence was introduced by plaintiff to the effect that before commencing operations a container was filled from each of the 18 valves of the Canco machine, taken off the machine and weighed individually to ascertain the actual weight of each container for each valve. If the weight was not correct an adjustment was made in the valves of the machine and the weight was rechecked. A similar procedure was adopted with respect to the Sealking machines except that there never was a need for adjustments in these machines since the testimony indicated that once the valve was set, the fill and consequently the weight of the quart always remained the same.

## TEST SHEETS

At the hearing plaintiff introduced test sheets for 84 of the 152 operating days during the six months in issue. These records contained two columns for weight entries for the Canco machine, the first column being the first weight and the second column for the adjusted weight, and a column for each side of each Sealking machine. For the Canco machine there are spaces for each

of the 18 valves and for the Sealking machines there are spaces for pints, one-third and half pints. As a production control measure plaintiff sought to put 2 pounds 2 ounces, equivalent to 2.125 pounds, or less in its quart paper containers of milk instead of 2 pounds 2¼ ounces, equivalent to 2.15 pounds.[5] Where the weight entered for the Canco machine in the first column was less than 2 pounds 3½ ounces (including container) or more than 2 pounds 3⅝ ounces (including container), there was an adjusted weight in the second column, an "O.K." in the second column or a mark of some kind against the weight in the first column. The quart weights entered for the Sealking machines were always 2 pounds 3½ ounces for container and fill. No adjusted weights were shown. For some days no figures were entered for the quart weights of one or both of the machines. No entry for either Sealking machine was reported in records for twenty-seven days, and on some of the sheets only weights for Sealking No. 2 were shown. As to the Sealking machines, the weights for half pints were always the same. The weights entered for pints from Sealking No. 1 were listed at 1 pound 1¾ ounces, whereas the weights for Sealking No. 2 were usually 1 pound 1⅝ ounces. There was testimony that records of a similar nature were kept by Mr. Eisenberg, vice-president of plaintiff, for the days that were missing but were inadvertently discarded.

## ORAL TESTIMONY

There was oral testimony by plaintiff's vice-president and also by experts for the American Can Company and for Sealright Oswego Falls Corporation, to the effect that once the valves were set on the Canco machine and the Sealking machines to deliver a fill of quarts, the same remained unchanged during the run and that consequently once they were set in the morning the fill remained the same throughout the day, so that the weights entered on the sheets at the beginning of a day's operation remained the same throughout the day. As to the Canco machine, Mr. Eisenberg, vice-president of plaintiff, testified that a cleaning or disassembling operation "put the adjustment of the filler valves out of kilter" (T. p. 30). Mr. Greame, the expert for the American Can Company, testified at one time that the cleaning operation could affect the valve adjustment (T. p. 53) and at another time (T. pp. 57–58) that the cleaning operation would not knock off the set screw, adding that "They shouldn't have to change it every day. It was testified they didn't change it every day and if it is necessary they change the set screw to the proper adjustment." As above stated, the testimony as to the Sealking machines indicated that once the valve was set there was no necessity for adjustments. Plaintiff contends that the test sheets together with the oral testimony concerning the missing sheets and the automatic operation of the machines sufficiently satisfies the requirement of specific weights.

The Judicial Officer refused to accept any of the sheets of weight entries as specific weights of quarts packaged during the six months in issue. He pointed out that there were certain variations shown on some of the filler valves on the Canco machine for consecutive days of operation and that testimony of the expert witness for the Canco machine indicated that the adjusting screw would not be knocked out of adjustment in cleaning at the end of a day's operations and consequently he implied that the differential which necessitated the adjustment at the beginning of a day's operations on this machine occurred during that day's operations.

With respect to the Sealking machines the Judicial Officer noted that the pint weights for Sealking No. 2 were usually ⅛ of an ounce less than the pint weights for Sealking No. 1. He further noted that in the accounting process, weights

5. Plaintiff's officer testified that since a quart was a volume it had determined that the minimal amount permissible in weight was 2 pounds 2 ounces.

of containers would have to be calculated, and that the actual container weights would probably be different than the figure impliedly indicated in plaintiff's sheets because this figure assumed that the weights for pint and half pint containers could be obtained by dividing quarts of filled containers into one-half and one-quarter, respectively. However possible or probable, there was no proof of a differential in the weight of the respective containers which would support the Officer's theory.

## CONCLUSION

■ It is not for the Court upon this review to determine the issue *de novo* upon the merits. Thus where the record below shows two different methods of testing with different results, the Court will not disturb the hearing officer's choice of one method over the other, Ogden Dairy Co. v. Wickard, supra, nor will the Court permit the use of different records where the Secretary's Order requires certain specific records to be kept in order to obtain the benefits of classification. Sauquoit Valley Farmers Cooperative, Inc. v. Wickard, N.D.N.Y.1942, 45 F.Supp. 104. Section 8(d) of the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. § 608(d), authorizes the Secretary to require such information and to examine such books and records as may be necessary to enable him to determine whether his orders have been carried out or the policy of the Act effectuated. Section 927.54 [6] of the Order provides for an audit and verification of the handler's records concerning the receipt and disposition of milk. It would follow that an audit and verification could not be made without records and consequently specific weights, if they were to be audited and verified, must be entered upon some records. In providing for the use of a table setting forth conversion factors "in the absence of specific weights", the regulation assumed that records would be kept for specific weights if their presence were to be relied upon. It is true that there is no specific standard as to what records should be kept but this does not dispense with the necessity of keeping reasonable records. Experience would indicate that such records need not show that every unit of milk was weighed, but they should be based upon a regular course of procedure or pattern which would make them reasonable and reliable records. There is no reason why oral testimony should not be admitted to show the record keeping procedure and the correctness and sufficiency of the records. Cf., Willow Farm Products Co. v. Brannan, N.D.Ill., 1950, 90 F.Supp. 195.

■■ Here no records for 68 days were available and the Judicial Officer refused to accept oral testimony in substitution therefor. We do not believe that there was any obligation upon him to accept such testimony in lieu of records and consequently we hold that his refusal was not arbitrary and was in accordance with law. The Officer also refused to accept records which were kept for 84 days, for the reasons above discussed. The basis for this refusal differed with respect to the machines covered by the records. As to the Canco machine, the Officer's refusal was based upon his finding that the testimony of the expert Greame indicated that adjustments made on this machine at the beginning of the run were necessitated by variations which occurred during the day's operations of the machine. This conclusion was based upon an erroneous interpretation of all the testimony including Greame's, and is not supported by substantial evidence. The records for the Canco machine covering the weights in quarts should not have been discarded.

■ The records covering the operations of the Sealking machines indicate that one of the machines was out of kilter, or the records covering the same were inaccurate because the records showed that in both machines the quart weight remained the same while in Sealking No. 1 machine the pint weights were consistently 1 pound 1¾ ounces,

---

6. Under the new numbering system this is now § 1002.54.

although in Sealking No. 2 machine the pint weights were consistently 1 pound 1⅝ ounces. Since the weight of the container in both cases was the same and the quarts were fed from the same spigots as the pints, the pint weights on both machines should have been identical if the quart weights on both machines were identical. Such discrepancy is not sufficient, however, to justify discarding the test sheets covering both machines. Since the pint weights recorded for Sealking No. 2 did not equal the quart weights, the Officer was justified under the circumstances in discarding these records. When records show only the beginning and the end of a machine's operations and the Officer is required to conclude that the results of the intervening period are the same because of the automatic operation of the machine, those records should be accurate and show an operation that is free from doubt. As to Sealking No. 2 machine no explanation was offered for the discrepancy shown in the records between the aggregate weight of 2 pints and the weight of 1 quart metered on this machine. In view of this differential, we believe the Officer was justified in discarding the records for Sealking No. 2 machine. However, we cannot find the same justification for his refusal to accept the records covering Sealking No. 1

machine since no such discrepancy existed and consequently we do not believe his action in this respect was supported by substantial evidence.

Finally, plaintiff advances a number of arguments attacking the validity and applicability of Sections 927.79 and 927.143, which assertions appear somewhat fanciful and metaphysical. For instance, in one of the contentions plaintiff claims that Section 927.79 is a rebuttable presumption but has been treated by the Officer as an irrebuttable presumption since the Officer completely ignored plaintiff's evidence of records showing actual receipts of milk which indicated that all milk it received was from a disclosed source.[7] The whole purpose of the table set forth in Section 927.231 is to test receipts by dispositions and to rely upon the latter instead of the former where there is a discrepancy. If we were to adopt plaintiff's theory of reliance upon records showing actual receipts, the test, i. e., the conversion factor, would be useless. It further argues that since the Officer unlawfully construed Section 927.79 as a conclusive presumption, the Officer's construction of Section 927.143 providing that the excess milk must be considered as having been received from an "undisclosed source", lacks any finding. Plaintiff made no effort to intro-

7. Plaintiff's additional arguments upon this point include claims (1) that the excess milk here involved is a nonassigned excess and hence the penalty to be applied is that one prescribed in Section 927.-143 applying the penalty set forth in Section 927.78(b) (3) [which under the new numbering arrangement is Section 1002.83], which penalty incidentally has now been invalidated by Leigh Valley Cooperative Farmers, Inc. v. United States, supra, note 1. This contention is invalid because the excess milk created by the conversion factor is expressly treated under Section 927.143 as milk from an "undisclosed source" and hence cannot be classified as "unassigned" excess milk, as that term is used in Section 927.143; (2) that Section 927.79 is unlawfully applied in this case because the excess milk was created by a pyramiding of presumptions. This is simply the reverse form of plaintiff's prior con-

tention to the effect that the conversion factor of 2.15 pounds per quart should not be applied here. Plaintiff treats the conversion factor of 2.15 pounds as a rebuttable presumption, which in itself may be questionable because such administrative devices do not fall within the category of ordinary presumptions. However that may be, plaintiff has had its opportunity to rebut the presumption or prevent the operation of the conversion factor and the creation of the excess resulting therefrom but has failed to do so. Upon such failure the 2.15 pounds per quart becomes, as a matter of fact, the weight of the milk disposed of and can no longer be treated as a presumption which is the base of a pyramid. The Secretary is authorized to treat the resultant excess in a manner which will effectuate the purpose of the Act.

duce evidence or to show in what respect Section 927.143 was unsupported by any finding. "Such an administrative determination carriers a presumption of the existence of a state of facts justifying the action far too strong to be overturned by such suggestions as are made here." United States v. Rock Royal Co-Op., 1939, 307 U.S. 533, 567–568, 59 S.Ct. 993, 1010, 83 L.Ed. 1446. We find no merit in the other contentions advanced by the plaintiff.

We conclude, therefore, that the refusal of the Judicial Officer to accept records showing specific quart weights for the Canco machine and for Sealking No. 1 machine was unsupported by substantial evidence but that his finding in all other respects is amply justified.

Settle order within ten (10) days on two (2) days' notice.