## LEHIGH VALLEY COOPERATIVE FARMERS, INC., ET AL. v. UNITED STATES ET AL.

No. 79.   Argued January 17–18, 1962.—Decided June 4, 1962.

*Willis F. Daniels* argued the cause for petitioners. With him on the briefs was *Donn L. Snyder.*

*Alan S. Rosenthal* argued the cause for the United States and the Secretary of Agriculture.   With him on the briefs were *Solicitor General Cox, Assistant Attorney General Orrick, Neil Brooks* and *Pauline B. Heller.*

Briefs of *amici curiae,* urging affirmance, were filed by *Frederic P. Lee, John A. Cardon, Leslie H. Deming, Frederick U. Conard, Jr., Thomas O. Berryhill, George M. St. Peter* and *Reuben Hall* for the Dairymen's League Cooperative Assn., Inc., et al.; *Louis J. Lefkowitz,* Attorney General of New York, *Paxton Blair,* Solicitor General, and *Robert G. Blabey* for the State of New York; *Thomas Debevoise,* Attorney General of Vermont, *Albert*

*L. Coles,* Attorney General of Connecticut, and *Reuben Hall* for the States of Vermont and Connecticut; and *David D. Furman,* Attorney General of New Jersey, and *William L. Boyan,* Deputy Attorney General, for Floyd R. Hoffman, Director of the Office of Milk Industry of New Jersey.

Briefs urging reversal were filed by *Walter F. Mondale,* Attorney General, and *Sydney Berde,* Deputy Attorney General, for the State of Minnesota, as *amicus curiae.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

Petitioners, operating milk processing plants in Pennsylvania, challenge the validity of certain "compensatory payment" provisions included in milk marketing orders affecting the New York-New Jersey area, which were promulgated by the Secretary of Agriculture under the authority granted him by § 8c of the Agricultural Marketing Agreement Act of 1937, 7 U. S. C. § 608c. That section permits the Secretary to issue regional regulations governing, in various enumerated respects, the marketing of certain agricultural commodities, among which is milk. This provision in question requires those who buy milk elsewhere and bring it into the region for sale as fluid milk to pay to the farmers who supply the region a fixed amount as a "compensatory payment." This amount is measured by the difference between the minimum price set by the Market Administrator for fluid milk and the minimum price for surplus milk. The judgment of the Court of Appeals for the Third Circuit, 287 F. 2d 726, upholding the validity of the "compensatory payment" provision here under attack,[1] conflicted with an earlier

_____

[1] The petitioners instituted this action challenging the validity of the compensatory payment provision by filing administrative petitions with the Secretary of Agriculture pursuant to § 8c (15) (A) of the Agricultural Marketing Agreement Act of 1937, 7 U. S. C. § 608c (15) (A). The Hearing Examiner sustained the petitioners'

decision rendered by the Court of Appeals for the Second Circuit, *Kass v. Brannan,* 196 F. 2d 791. To resolve this conflict we granted certiorari. 366 U. S. 957.

## I.

### THE GENERAL SCHEME OF MILK REGULATION.

The order around which the present controversy centers, now titled Milk Marketing Order No. 2, 7 CFR §§ 1002.1 *et seq.,*[2] though somewhat more complex than others, is in its general outline representative of the pattern of regulation established by the Secretary for the promotion of orderly marketing conditions in the milk industry and the preservation of minimum prices for farmers. Pursuant to the authority granted by § 8c (5) (A),[3] the Order classifies milk that is sold within

---

contentions on the authority of *Kass v. Brannan,* 196 F. 2d 791, but the Judicial Officer, acting on behalf of the Secretary of Agriculture, dismissed the petitions.

Petitioners then sought review of the Secretary's ruling in the District Court under § 8c (15) (B) of the Act. The review proceedings were consolidated with enforcement actions brought by the Government pursuant to § 8a (6) of the Act. The District Court, relying on *Kass v. Brannan, supra,* held that the payment provision was invalid. 183 F. Supp. 80. It was this decision that was reversed by the Court of Appeals. 287 F. 2d 726.

[2] A general reorganization of Chapter IX of Title 7 of the Code of Federal Regulations during the past year has resulted in redesignation of most of the milk marketing orders. The New York-New Jersey Order had previously been designated as Milk Marketing Order No. 27 and had been found at 7 CFR § 927. The section references and the contents of the regulations as quoted throughout this opinion are as they were in effect on January 1, 1962.

[3] Section 8c (5) (A) provides:

"(5) *Milk and its products; terms and conditions of orders.*

"In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and condi-

the New York-New Jersey marketing area "in accordance with the form in which or the purpose for which it is used." Milk that contains 3% to 5% butterfat—the usual proportion in ordinary liquid milk—and is sold for fluid consumption is assigned to Class I. Milk that is used for cream (sweet and sour), half and half, or milk drinks containing less than 3% or more than 5% butterfat is classified in Class II. The remainder—milk that is to be stored for a substantial period and used for dairy products such as butter and cheese—is grouped in Class III. 7 CFR § 1002.37.

This classification reflects the relative prices usually commanded by the different forms of milk. Thus, highest prices are paid for milk used for fluid consumption, and the lowest for milk which is to be processed into butter and cheese. Since the supply of milk is always greater than the demands of the fluid-milk market, the excess must be channeled to the less desirable, lower-priced outlets. It is in order to avoid destructive competition among milk producers for the premium outlets that the statute authorizes the Secretary to devise a method whereby uniform prices are paid by milk handlers to producers for all milk received, regardless of the form in which

---

tions, and (except as provided in subsection (7) of this section) no others:

"(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers." 7 U. S. C. § 608c (5) (A).

80

it leaves the plant and its ultimate use. Adjustments are then made among the handlers so that each eventually pays out-of-pocket an amount equal to the actual utilization value of the milk he has bought.

Under the Marketing Order here in question it is primarily the handlers whose plants are located within the marketing area and who regularly supply that area with fluid milk who are regulated. *All* handlers who receive or distribute milk within the area are required to submit monthly reports to the Market Administrator, listing the quantity of milk they have handled and the use for which it was sold. But only the handlers operating "pool plants"—*i. e.*, plants which meet certain standards set out in 7 CFR §§ 1002.25–1002.29 [4]—must pay the producers from whom they buy the uniform price set by the Administrator. This price is calculated each month on the basis of the reports that are submitted. After determining the minimum prices for each use classification pursuant to formulas set out in 7 CFR § 1002.40, the Administrator computes an average price for the "pool" milk handled during that month. This figure is reached by first multiplying the "pool" milk disposed of in each class by the established minimum price for that class, and then adding the products to the "compensatory payments" made for nonpool milk. After certain minor adjustments are made, this sum is divided by the total quantity of "pool" milk sold in the market during the month. The quotient is a "blend price." With some adjustments to reflect transportation expenses, this uniform price must be paid to producers by all handlers maintaining "pool" plants. 7 CFR § 1002.66.

---

[4] These provisions establish certain performance requirements aimed at insuring that the plant continues to provide fluid milk to the marketing area even in periods of short supply. Thus, it is primarily the handlers whose main concern is the marketing area who qualify for the "pool."

Adjustments among handlers are made by way of a "Producer Settlement Fund," into which each handler contributes the excess of his "use value" [5] over the uniform price paid by him to his producer. Handlers whose "use value" of the milk they purchase is less than the "blend price" they are required to pay may withdraw the difference from the fund. The net effect is that each handler pays for his milk at the price he would have paid had it been earmarked at the outset for the use to which it was ultimately put. But the farmer who produces the milk is protected from the effects of competition for premium outlets since he is automatically allotted a proportional share of each of the different "use" markets.

## II.

### THE COMPENSATORY PAYMENT PROVISION.

It will thus be seen that this system of regulation contemplates economic controls only over "pool-handler" plants since only such handlers are required to pay the "blend price" to their producers and to account to the Producer Settlement Fund. If limited to the provisions recounted above, the regulatory scheme would not affect milk brought into the New York-New Jersey marketing area by handlers who are primarily engaged in supplying some other market and whose producers are not located within the New York-New Jersey area. Some of the regional orders now in effect do not undertake any economic regulation of "outside" or "other source" milk.[6] But it is quite obvious that under certain circumstances some regulation of such milk may be necessary. Accord-

---

[5] "Use value" is the price the handler would have had to pay, at prevailing minimum rates, had he purchased his milk at a price reflecting its ultimate disposition.

[6] See 7 CFR §§ 1034 (Dayton-Springfield), 1037 (North Central Ohio), 1038 (Rockford-Freeport), 1074 (Southwest Kansas).

ingly, § 8c (7)(D) of the Act, 7 U. S. C. § 608c (7)(D), authorizes the Secretary to include in his regulating orders conditions that are incidental to terms expressly authorized by the statute, and that are "necessary to effectuate the other provisions of such order."

A handler who brings outside milk into a marketing area may disrupt the regulatory scheme in at least two respects:

> (1) *Pool handlers* in the marketing area who are required to pay the minimum class prices for their milk may find their selling prices undercut by those of nonpool handlers dealing in outside milk purchased at an unregulated price.

> (2) *Producers* in the marketing area, whose "blend price" depends on how much of the relatively constant fluid-milk demand they supply in a given month, may find the outside milk occupying a portion of the premium market, thus displacing the "pool" milk and forcing it into the less rewarding surplus uses, with the ultimate effect of diminishing the "blend price" payable to producers.

In an effort to cope with these disruptive economic forces, the Secretary devised his "compensatory payment" plan. In essence the plan imposes special monetary exactions on handlers introducing "outside" milk for fluid consumption into a marketing area in months when there is a substantial surplus of milk on the market.[7]

Of the 68 regional milk orders which establish marketwide pools,[8] 64 contain "compensatory payment" provi-

---

[7] The payment provision of 7 CFR § 1002.83 applies only in those months when the volume of milk sold for Class III use exceeds 15% of the total pool milk reported in the marketing area.

[8] The Act authorizes the establishment of either marketwide pools or individual handler pools. Since the latter require only that each handler pay uniform prices to all the producers from which he buys, but does not impose a uniformity requirement among the various

sions of one kind or another. The Order now before us is typical of 23 of these orders.[9] The Order provides that a handler who brings "outside" milk into the New York-New Jersey area and sells it for fluid use must pay to the pool's producers, through the Producer Settlement Fund, an amount equal to the difference between the minimum prices for the highest and for the lowest use classifications prevailing in that area. In other words, for each hundredweight of nonpool milk sold for Class I use in the New York-New Jersey area, a payment equal to the difference between Class I and Class III prices must be made by the seller to the Producer Settlement Fund.

## III.

### The Purpose and Effect of the Compensatory Payment.

After the Court of Appeals for the Second Circuit had held the compensatory payment requirement in the New York-New Jersey Milk Marketing Order (then Order No. 27) to be a "penalty," *Kass* v. *Brannan*, 196 F. 2d

---

handlers, there is no need for adjustments among handlers. Consequently, no compensatory payment provision is included in orders establishing individual handler pools. See 7 CFR §§ 1004 (Philadelphia), 1005 (Tri-State), 1010 (Wilmington), 1039 (Milwaukee), 1041 (Toledo), 1044 (Michigan Upper Peninsula), 1078 (North Central Iowa), 1096 (Northern Louisiana), 1097 (Memphis), 1102 (Fort Smith), 1129 (Austin-Waco), 1130 (Corpus Christi), 1134 (Western Colorado).

[9] Compare 7 CFR §§ 1001.65 (Greater Boston), 1003.62 (Washington, D. C.), 1006.65 (Springfield, Mass.), 1007.65 (Worcester), 1008.54 (Wheeling), 1009.54 (Clarksburg, W. Va.), 1011.62 (Appalachian), 1014.46 (Southeastern New England), 1015.46 (Connecticut), 1016.62 (Upper Chesapeake Bay), 1030.61 (Chicago), 1031.70 (b) (South Bend-La Porte-Elkhart), 1036.84 (b) (Northeastern Ohio), 1048.54 (Greater Youngstown-Warren), 1061.54 (St. Joseph), 1068.70 (b) (Minneapolis-St. Paul), 1071.62 (b) (Neosho Valley), 1072.55 (Sioux Falls-Mitchell), 1106.55 (Oklahoma), 1125.70 (Puget Sound), 1126.70 (d) (North Texas), 1133.70 (b) (Inland Empire).

791, 795, the Secretary of Agriculture conducted extensive hearings to determine whether it should be retained. His findings, which appear at 18 Fed. Reg. 8444–8454, explain this requirement as the most satisfactory means of imposing "a suitable charge on such unpriced milk in an amount sufficient to neutralize, compensate for and eliminate the artificial economic advantage for non-pool milk which necessarily is created by the classified pricing and pooling of pool milk under the order." *Id.*, at 8448. There seems little doubt that an assessment equal to the Class I-Class III differential would, in all but rare instances, nullify any competitive advantage that non-pool milk could have: only if the sum of the purchase price of the outside milk and the cost of its transportation to market were less than the Class III price would a handler find it profitable to bring such milk into the marketing area. But it must be obvious that this payment is wholly or partially "compensatory"—*i. e.*, puts pool and nonpool milk "on substantially similar competitive positions at source" (*ibid.*)—only if the milk has been purchased at not more than the Class III price. If the purchase price of the nonpool milk exceeds the Class III price within the area, the effect of the fixed compensatory payment is to make it economically unfeasible for a handler to bring such milk into the marketing area.

The Secretary of Agriculture's determination that the Class I-Class III differential was the most suitable compensatory figure rested upon what was, in effect, an irrebuttable presumption that the nonpool milk was purchased at a rate commensurate with the value of "surplus" (Class III) milk. See 18 Fed. Reg., at 8448.[10]

---

[10] "As stated earlier herein, all milk which is established to be primarily associated with the New York milk marketing area under the standards prescribed by the order is included in the New York pool. Conversely, the non-pool milk which enters the marketing area for fluid use originates from plants which are not sufficiently associated

That presumption was based in turn on the supposition that the nonpool milk could not have been worth more than the Class III price where purchased since it could not be shipped elsewhere for Class I use.   But it must

with the New York market to have their milk in the pool.   Such plants have their primary interests in other fluid markets or specialized manufacturing uses and frequently have more milk than is required for these primary purposes.   It is this surplus milk at non-pool plants which can be 'dumped' into the New York market for fluid use, provided only that the plant and the milk [have] marketing area health approval.   The operator of such a non-pool plant has a choice of using the excess milk for surplus uses (ordinarily in the manufacture of various milk products) or of sending it to the New York marketing area for fluid uses.   In making this decision he will compare the respective net returns to him for this surplus milk and will naturally select the fluid alternative, for it will yield the greater return.   In the absence of classified pricing, his cost, at source, for the excess milk remains exactly the same whether he uses it for surplus disposition or for fluid use.   The pool plant operator on the other hand has no such advantage for he pays a higher classified price, at source, if he sells the milk in the market area for fluid use (Class I-A or II) than if he disposes of it for surplus manufacturing uses (Class III).

"If this artificial advantage in favor of surplus non-pool milk at the plant of origin is to be effectively removed, as it must be, the milk must be treated and evaluated for what it actually is, namely surplus milk in the milkshed.   If New York marketing area disposition were not available for this surplus, the non-pool handler could derive from it only its surplus value.   This surplus value is its true value or 'opportunity cost' and such surplus value should be used as the subtrahend in the formula for compensation payments on non-pool milk from plants not subject to a Federal order.

"The Class III price under the New York order is the class price which is payable, at source, for pool milk under the New York order when used for most surplus uses.   It is expressly designed to fix a proper classified value, at source, for surplus milk.   The Class III price closely approximates the amount paid in the Northeast to farmers not under the New York order for so much of their milk as is used for general manufacture.

"It is therefore a dependable indicator of the value of surplus milk at source.   If a non-pool handler, for his own reasons, chooses to pay

be apparent that it is only if the milk is denied access to other marketing areas or if a prohibitive payment is assessed on its use elsewhere that it will depreciate in value to Class III levels. For if the milk can be freely shipped elsewhere for fluid use or if it is purchased in an area where prices paid to producers are regulated, it will command a higher price.

Indeed, the facts of the case now before us demonstrate the shortcomings of the Secretary's reasoning. One of the petitioners, Suncrest Farms, Inc., purchases its milk in Pennsylvania under regulations established by the Pennsylvania Milk Control Commission. In September 1957, which was one of the months during which it sought to sell its milk in the New York-New Jersey Marketing Area, Suncrest was required to pay $6.40 per cwt. for the milk it purchased from dairy farmers in Pennsylvania. The Class I-Class III differential in the New York-New Jersey Marketing Area during that month was $2.78 per cwt. Thus, if the "compensatory payment" were assessed, Suncrest would actually be forced to pay $9.18 per cwt. for fluid milk sold in the area, while the handlers maintaining pool plants in the area would pay only the Class I price, which was $6.23 in August 1957.[11]

If competitive parity among *handlers* of pool and nonpool milk were the only objective of the Secretary's "compensatory" regulation, other marketing orders of the Secretary show that this result has been achieved without imposing unnecessary hardships, virtually "trade

---

more than its true market value, at source, for surplus milk which he sends to the New York area, the pool should not underwrite this unnecessary cost, particularly since the premium can be used to outbid pool handlers for milk, as previously shown."

[11] The fact that petitioners were paying more for their milk than the Class I price in the New York-New Jersey Marketing Area leaves no room for any suggestion that they will be receiving a "windfall" if it is ultimately adjudged that they are entitled to have returned the full amount of their compensatory payments.

barriers" as in the instance just given,[12] on the nonpool milk.[13]

It is in considering the effect of the present compensatory payment provision on the pool *producers,* however,

[12] The total amount of the compensatory payments involved in this litigation, embracing a period of approximately four years, was some $617,000 as to Lehigh Valley and $108,000 as to Suncrest.

[13] Several of the marketing orders make the compensatory payment equal the difference between the Class I price in the marketing area and the actual cost of the nonpool milk. See 7 CFR §§ 1042.60 (Muskegon), 1128.62 (b) (Central West Texas). In some marketing areas the handler who deals in nonpool milk is permitted to elect each month between paying the fluid milk-surplus use differential and paying the difference between his actual cost and the minimum regional price for Class I milk. See 7 CFR §§ 1013.62 (Southeastern Florida), 1033.61 (Greater Cincinnati), 1035.63 (Columbus, Ohio), 1040.66 (Southern Michigan), 1043.84 (Upstate Michigan), 1045.83 (Northeastern Wisconsin), 1047.62 (Fort Wayne), 1064.61 (Greater Kansas City), 1065.62 (Nebraska-Western Iowa), 1067.61 (Ozarks), 1069.62 (Duluth-Superior), 1073.62 (Wichita), 1094.62 (New Orleans), 1098.92 (Nashville), 1103.62 (Central Mississippi), 1105.62 (Mississippi Delta), 1107.61 (Mississippi Gulf Coast), 1131.62 (Central Arizona), 1135.62 (Colorado Springs-Pueblo), 1136.62 (Great Basin), 1137.62 (Eastern Colorado).

Other marketing orders, applicable in some areas, assess a compensatory payment equal to the difference between the "blend price" paid in the area for pool milk and the Class I price, thus treating the handler of nonpool milk as if he were a member of the pool with respect to such milk as he introduced into the marketing area.

Where this differential is accepted as the measure of the compensatory payment it is done only in those months when the surplus is lowest. In the spring and summer months the fluid milk-surplus use differential is exacted. See 7 CFR §§ 1032.55 (b) (Suburban St. Louis, August–February), 1046.55 (b) (Ohio Valley, August–March), 1049.55 (b) (Indianapolis, August–March), 1062.55 (b) (St. Louis, August–February), 1063.63 (b) (Quad Cities-Dubuque, July–November), 1066.57 (a) (Sioux City, August–February), 1070.63 (b) (Cedar Rapids-Iowa City, July–November), 1075.63 (b) (Black Hills, July–March), 1076.63 (b) (Eastern South Dakota, July–February), 1079.63 (b) (Des Moines, July–March), 1090.54 (b) (Chattanooga, August–February), 1095.70 (e) (2) (Louisville-Lexington, October–De-

that the principal concern of the Secretary becomes quite apparent. As has been noted (p. 82, *supra*), the sale for fluid use of nonpool milk in the marketing area displaces pool milk that might otherwise be used for this premium outlet. Since the market area's "blend price" is computed only with reference to the pool milk, the effect of the entry of nonpool milk is to drive down the price that

cember), 1099.62 (a) (Paducah, August–March), 1101.93 (b) (Knoxville, August–February), 1104.53 (b) (Red River Valley, August–January), 1108.54 (b) (Central Arkansas, August–February), 1127.65 (b) (San Antonio, January and August), 1132.63 (b) (Texas Panhandle, July–February).

The latter method treats the handler of nonpool milk who buys at a price in excess of the blend price as if he were a member of the pool since a handler in the pool may, if he chooses, pay his producer *more* than the "blend price" set by the Market Administrator, see *Stark* v. *Wickard,* 321 U. S. 288, 291, but must still account to the Producer Settlement Fund as if he had paid only the "blend price." By treating nonpool milk in the same manner, the Secretary might be able to justify a compensatory payment equal to the difference between the nonpool milk's "use value" and the "blend price," though we do not decide the question. See generally Hutt, Restrictions on the Free Movement of Fluid Milk Under Federal Milk Marketing Orders, 37 U. Det. L. J. 525, 564–577 (1960).

The suggestion that a nonpool handler would be given a competitive advantage under either of these methods because, in the words of the Judicial Officer, he does not have "to equalize his utilization" as do pool handlers is demonstrably unsound. Insofar as the handlers' *sale* of milk is concerned, neither pool nor nonpool handlers are required to share or "equalize" their proceeds with others. To the extent that this contention relates to the handlers' *purchase* of milk and is meant to suggest that nonpool handlers will find it easier to buy milk because they will be able to pay higher prices to their producers, the exaction of a Class I-blend price payment would effectively discourage purchases in excess of the blend price (which is what the pool's producers are paid). And the assertion that the pool "carries the surplus burden for outside handlers" is based on the same mistaken reasoning as underlies the Secretary's determination to retain the Class I-Class III payment after *Kass* v. *Brannan, supra.* See pp. 84–86, *supra.*

is paid to producers in the area. A close examination of the workings of the present compensatory payment provision reveals that its effect is to preserve for the benefit of the area's producers the blend price that they would receive if all outside milk were physically excluded and they alone would supply the fluid-milk needs of the area. For every cwt. of pool milk that is forced into "surplus" use by the entry of nonpool milk, the handler introducing the outside milk is required to pay for the benefit of the area's producers the difference between the value the pool milk would have had if the nonpool milk had never entered and the value it has once the nonpool milk is sold for fluid use.[14] In effect, therefore, the nonpool milk is

---

[14] A highly simplified illustration serves to clarify this effect: If the Class I price on a given date is $6 per cwt. and the Class III price is $3 per cwt., and if 2,000 cwt. are consumed as fluid milk and another 2,000 cwt. are produced by the dairy farmers in the area and utilized for surplus uses, the computation of the blend price would be as follows:

*Table A.*

| | | | | |
|---|---|---|---|---|
| Class I...................... | 2,000 | x 6.00 | equals | 12,000 |
| Class III.................... | 2,000 | x 3.00 | equals | 6,000 |
| Totals................... | 4,000 at | | | 18,000 |
| Blend Price....................... $4.50 | | | | |

If 500 cwt. are then brought in from the outside as nonpool milk and sold for Class I use, 500 cwt. of the pool milk will drop into Class III (since the fluid milk demand remains relatively constant):

*Table B.*

| | | | | |
|---|---|---|---|---|
| Class I...................... | 1,500 | x 6.00 | equals | 9,000 |
| Class III.................... | 2,500 | x 3.00 | equals | 7,500 |
| Totals................... | 4,000 at | | | 16,500 |
| Blend Price..................... $4.125 | | | | |

The producers in the pool would thereby be receiving $.375 less per cwt. than had the nonpool milk stayed out altogether. By distributing to them (through the exaction made of nonpool handlers) the difference between Class I and Class III prices multiplied by the

forced to subsidize the pool milk and insulate the pool milk from the competitive impact caused by the entry of outside milk. This was recognized by the Court of Appeals which held that such a compensatory payment

amount of nonpool milk sold in the area as Class I, that deficit is restored. Thus,

*Table C.*

(Nonpool milk sold as Class I) x (Class I minus Class III)

*equals*

(Loss to pool by displacement of Class I outlet)

*or*

500 x 3.00 equals 1,500

1,500 divided by 4,000 cwt. equals .375 per cwt.

The Secretary's formula, therefore, precisely accomplishes the restoring to the pool's producers whatever they have lost by reason of the occupation of their Class I outlet by the nonpool milk.

It should be noted that the actual computation of the blend price, as set out in 7 CFR § 1002.66, achieves this same result in an indirect fashion. Instead of computing the blend price without reference to any nonpool milk, the Secretary's formula includes the compensatory payments within the list of minimum-price obligations that are added in determining the total proceeds for milk sold within the area. 7 CFR § 1002.66 (e). But the blend price is then computed by dividing this sum by the amount of "milk delivered by producers," *i. e.,* pool milk. Consequently, the actual computation of the uniform price under the above illustration would be as follows:

*Table D.*

| | | | |
|---|---|---|---|
| Class I..................... | 1,500 x 6.00 equals | 9,000 |
| Class III................... | 2,500 x 3.00 equals | 7,500 |
| Compensatory payments (non-pool milk)............... | 500 x 3.00 equals | 1,500 |
| Totals (pool milk)....... 4,000 at | | 18,000 |
| Blend Price...................... $4.50 | | |

The funds paid into the Producer Settlement Fund by the handlers dealing in nonpool milk are then available to the pool handlers, whose credits from the Fund will be larger to the extent that they have been forced to pay a higher blend price.

was "designed to compensate the pool for the loss of the Class I fluid milk utilization and . . . protect the uniform blend price in the marketing area." 287 F. 2d, at 730. It is only if the Secretary has been authorized by the statute to impose such economic trade barriers on the entry of milk into an area so as to protect the prices received by the pool producers that the present compensatory payment plan can be sustained as "necessary to effectuate" the expressly authorized provisions of this Order.

## IV.

### Section 8c (5)(G).

Section 8c (5)(G) of the Act, however, taken in light of its legislative history, indicates that the regulation here imposed by the Secretary was of the sort that Congress intended to forbid. Section 8c (5)(G) provides:

"No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States."

This provision was first enacted into law as part of the Agricultural Adjustment Act of 1935, 49 Stat. 750, amending the Agricultural Adjustment Act of 1933, 48 Stat. 31. It was re-enacted as part of the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, which reaffirmed the marketing order provisions of the 1935 Act after the processing tax had been struck down as unconstitutional in *United States* v. *Butler,* 297 U. S. 1.

Along with enumerating the powers granted to the Secretary of Agriculture so as to avoid the "delegation" problems brought to light by the then recent decision in *Schechter* v. *United States,* 295 U. S. 495, the Congress

sought in 1935 to limit the Secretary's powers so as to prevent him from establishing "trade barriers." Midwestern legislators were particularly concerned over this possibility. When the reported bill which contained no provision like the present § 8c (5)(G) came to the floor of the House of Representatives, Representative Andresen of Minnesota suggested that the Secretary might use his powers to "stop the free flow in commerce . . . of dairy products." He received an assurance from Representative Jones, the Chairman of the House Committee on Agriculture, that the Secretary was not authorized to require anything more of milk coming into a marketing area than that it "comply with the same conditions which the farmers and distributors comply with in that region." 79 Cong. Rec. 9462.[15] An amendment to the bill clarifying this position was then offered by Representative

---

[15] "Mr. ANDRESEN. Is there anything in the milk section of the bill which gives the Secretary authority to set up trade barriers and stop the free flow in commerce throughout the United States of dairy products?

"Mr. JONES. No. There is nothing in the bill that would authorize that. The Secretary may require that in crossing from one region to another that they comply with the same conditions which the farmers and distributors comply with in that region.

"Mr. ANDRESEN. That is, sanitary regulations?

"Mr. JONES. Sanitary and other uniform regulations; *but he cannot set up any trade barriers which would keep them out.*

"Mr. ANDRESEN. A great many Members have inquired about that feature, and I just wanted the gentleman to bring that out.

"Mr. JONES. The amendments require a uniform price and uniform set of conditions and fair distribution. In the first place, I do not believe we could give authority to set up these barriers. In the second place, the bill does not do that. It simply enables them to have a program in one of these regions, and in developing these orders which the Secretary issues, he uses the word 'region' wherever possible. Those on the outside must come into that." (Emphasis added.)

Sauthoff of Wisconsin, 79 Cong. Rec. 9493,[16] but no action was taken on that proposal.

On the next day, Representative Andresen proposed from the floor of the House the forerunner to the present § 8c (5)(G). 79 Cong. Rec. 9572. His amendment took the following form:

"(g) No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit the marketing in that area of any milk or product thereof produced in any production area in the United States."

There was no objection to the addition of this language, Representative Jones remarking that "[i]t is simply clarifying." *Ibid.* But when Representative Sauthoff sought to change the amendment by substituting the words "limit or tend to limit" for "prohibit," Representative Jones objected on the ground that necessary milk classification and minimum pricing for the protection of outside milk producers regularly supplying their own marketing area would "tend to limit" the introduction of their milk into other areas.[17] *Ibid.*

---

[16] The proposed amendment read:

"Sec. — (b) No marketing agreement, order, or regulation shall contain any term or provision which will tend to result in preventing or hindering any agricultural commodity or product thereof produced in any region or area of the United States from being brought into or sold in any other such region or area, or shall have the effect of subsidizing the production or sale of any agricultural commodity or product thereof in any such region or area, in such a manner that such commodity or product thereof will tend to be sold in such other region or area at prices which will tend to depress prices therein of such commodity or product thereof."

[17] "Mr. JONES. Mr. Chairman, the adoption of the amendment of the gentleman from Wisconsin would absolutely wreck the whole milk program. In order to get away from the terrific conditions that have prevailed in the milk industry there is provided in the bill

The House bill, with the language added by Representative Andresen's amendment, went to the Senate. Accompanying the bill to the floor was S. Rep. No. 1011, 74th Cong., 1st Sess., which stated, at p. 11:

"To prevent assaults upon the price structure by the sporadic importation of milk from new producing areas, while permitting the orderly and natural expansion of the area supplying any market by the introduction of new producers or new producing areas, orders may provide that for the first 3 months

---

authority to fix a minimum price to producers. That, at least in a measure, would limit or tend to limit shipment, and yet the gentleman, I am sure, does not want to interfere with the price to producers. Then it is a universal custom in the marketing of milk to classify milk. This, in a way, is a limitation. . . .

"Mr. BOILEAU. . . . Mr. Chairman, I should like to ask the distinguished chairman of the committee if in his opinion there is anything in this bill that gives to the Secretary of Agriculture or to anyone else any power to restrict the free flow of milk or any other commodity between the various States?

"Mr. JONES. No; there is nothing in it that will do that. The only tendency is to make all sections comply with the same rules.

. . . . .

"Mr. HULL. . . . Mr. Chairman, if there is nothing in this bill which would authorize the Secretary of Agriculture or any subordinate so to limit transportation or shipment of dairy products from one State into another, then the amendment of the gentleman from Minnesota as amended by the amendment of the gentleman from Wisconsin [Mr. Sauthoff] can do no harm.

"The three States of Minnesota, Iowa, and Wisconsin, produce about 45 percent of the butter made in this country and we are interested in this matter of the shipment of dairy products to other States.

"Mr. JONES. Mr. Chairman, will the gentleman yield?

"Mr. HULL. I yield.

"Mr. JONES. Would the gentleman object to the requirement that Chicago dealers pay the Wisconsin producer a minimum price?

"Mr. HULL. Not at all.

"Mr. JONES. That certainly would tend to limit."

of regular delivery, payments shall be made to producers not theretofore selling milk in the area covered by the order at the price fixed for the lowest use classification. *This is the only limitation upon the entry of new producers—wherever located—into a market, and it can remain effective only for the specified 3-month period."* (Emphasis added.) [18]

In the Senate § 8c (5)(G) was amended, without objection, 79 Cong. Rec. 11655, to read:

"(G) No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, except as provided for milk only in subsection (d), the marketing in that area of any milk or product thereof produced in any production area in the United States." [19]

Section 8c (5)(G) emerged from conference in its present form. The conference report explained how the differences between the House and Senate versions were resolved (H. R. Rep. No. 1757, 74th Cong., 1st Sess. 21):

". . . The conference agreement retains the House provision with respect to prohibitions on marketing of both milk and products of milk. The conference agreement also denies the authority to limit in any manner the marketing in any area of milk products (butter, cheese, cream, etc.) produced anywhere in the United States. The language adopted by the conference agreement does not refer to milk, and so does not negative the applicability to milk, for use in fluid form or for manufacturing purposes, of the pro-

---

[18] The "3-month period" provision here referred to is the present § 8c (5)(D) which authorizes the Secretary to set the surplus-use price as the price to be paid to any new producer who enters the pool. In the final version of the Act the introductory period was reduced to two months.

[19] "Subsection (d)" is § 8c (5)(D). See note 18, *supra*.

visions of the bill relating to milk, such as the provisions on price fixing, price adjustment, payments for milk, etc."

When the conference agreement came to the floor of the House, Representative Jones again explained what § 8c (5)(G), when taken together with § 8c (5)(D), meant (79 Cong. Rec. 13022):

"Mr. SNELL. . . . I do not understand exactly what this means, 'No marketing agreement or order applicable to milk and its products,' and so forth.

"Mr. JONES. That simply applies to fluid milk. You cannot make any limitation at all on the amount of butter or cheese or milk products that are shipped from any one area to another, *and the limitation that may be applied on milk is only such limitation as puts each area on an equality with the other areas after a certain period of about 2-1/2 months.*

.        .        .        .        .

"Mr. SNELL. How does that change the situation from the present law?

"Mr. JONES. The provisions of this particular bill would enable that area to be protected from being swamped with fluid milk from the outside, bought at any old price. For instance, if you do not have the protection of this bill they would run into the same trouble they ran into in the New York milk cases, where they went into New Hampshire and bought milk at a lower price and came in and broke down your milk agreements. Under the provisions of this bill if a price were fixed in this particular area in New York, then if anyone bought milk from an outside area and brought it in he would be compelled to *pay the producer the same price that was being paid the producers within the area* and comply with

all regulations and requirements of that area. For the first 2 months he would be required to take the manufacturer's price." (Emphasis added.)

This history discloses that rather than being confined, as Judge Learned Hand suggested in *Kass* v. *Brannan*, 196 F. 2d, at 800, to practices aimed at the exclusion of cheese and other milk products from eastern markets, § 8c (5)(G) was compendiously intended to prevent the Secretary from setting up, under the guise of price-fixing regulation, any kind of economic trade barriers, whether relating to milk or its products. Whenever there was an attempt to broaden the language of subsection (G) to encompass "limitations" as well as "prohibitions," those opposing it pointed only to the fact that "limit" might be read as including the type of price fixing covered by subsection (D)—*i. e.,* allowing new pool producers only manufacturing-use prices for a limited period—or other attempts to put outside milk on an equal footing with pool milk. Although the words of § 8c (5)(G), "in any manner limit," must be taken, in the context of their legislative history, as referring only to milk products, that history likewise makes it clear that as regards milk the word "prohibit" refers not merely to absolute or quota physical restrictions, but also encompasses economic trade barriers of the kind effected by the subsidies called for by this "compensatory payment" provision.

## V.

### THE INVALIDITY OF THE PRESENT COMPENSATORY PAYMENT PROVISION.

In light of the legislative history of § 8c (5)(G) we conclude that the compensatory payment provision of the New York-New Jersey Milk Marketing Order must fall as inconsistent with the policy expressed by Congress in

that section.[20]   Because it conflicts with § 8c (5)(G), the payment provision cannot be justified under the general terms of § 8c (7)(D), which prevents the inclusion of conditions that are inconsistent with express statutory provisions.   Nor is the compensatory payment clause saved by the circumstance that in some instances it may also fortuitously operate to put the handlers of pool and nonpool milk on a competitive par.   As has been pointed out (note 13, *supra*), there are other means available to the Secretary for achieving this result, while affording protection to pool producers, without imposing almost insuperable trade restrictions on the entry of nonpool milk into a marketing area.

The Government contends that the effect of § 8c (5)(G) may not be considered by this Court since that provision was not cited by the petitioners in the administrative proceeding in the Department of Agriculture.   But even on the Government's premise that an unauthorized regulation should be upheld by this Court merely because the provision prohibiting it was not cited in the administrative proceeding in which it was attacked, this case presents no such instance.   The administrative petition filed with the Department of Agriculture alleged that the effect of the compensatory payment clause amounted "to establishing tariffs or barriers interfering with the free flow of milk across state lines," an obvious reference to the prohibition of § 8c (5)(G).

In addition, the Government contends that the petitioners had the choice of joining the market-wide pool, in which case they would not have been subject to the compensatory payment provisions.   Their election to stay

---

[20] While we need not reach the point, we would have difficulty in concluding, as did the Court of Appeals for the Second Circuit in *Kass* v. *Brannan, supra,* that the provisions of § 8c (5)(A) precluded, in themselves, the promulgation of the present compensatory payment provision.

out of the pool, it is argued, bars any attack on the consequences of their choice. However, such an "election" is surely illusory. The consequences of joining the pool would have been that petitioners would have been forced to pay the "blend price" to all their producers wherever located and account to the Producer Settlement Fund for all milk wherever sold. In these circumstances the election was not voluntary as in *Booth Fisheries* v. *Industrial Comm'n*, 271 U. S. 208, 211. It was coercive and, indeed, no election at all.

Whether full regulation of the petitioners would be permissible under the Act is a question which we need not reach in this case. If the Secretary chooses to impose such regulation as a consequence of a handler's introducing any milk into a marketing area, the validity of such a provision would involve considerations different from those now before us. With respect to these petitioners, however, and with regard to the regulation here in issue, we conclude that the action of the Secretary of Agriculture exceeded the powers entrusted to him by Congress.

The Secretary of course remains free to protect, in any manner consistent with the provisions of the statute, the "blend price" in this or any other marketing area against economic consequences resulting from the introduction of outside milk. We do not now decide whether or not any new regulation directed to that end could be made to apply retrospectively, or whether, if it could be validly so applied, the presently impounded funds could be resorted to *pro tanto* in its effectuation. Cf. *United States* v. *Morgan*, 307 U. S. 183. "What further proceedings the Secretary may see fit to take in the light of our decision, or what determinations may be made by the District Court in relation to any such proceedings, are not matters which we should attempt to forecast or hypothetically to decide." *Morgan* v. *United States*, 304 U. S. 1, 23, 26.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE FRANKFURTER took no part in the decision of this case.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, dissenting.

I find it impossible to agree with the Court's holding or opinion. In 1936, in *United States* v. *Butler*,[1] this Court temporarily paralyzed the national farm recovery program by holding important parts of the Agricultural Adjustment Act of 1933 unconstitutional and by casting grave doubts upon the remainder of that Act which had been passed at the bottom of the Great Depression for the express purpose of alleviating the desperate economic plight of the American farmer. Following that decision Congress, in 1937, with unusual promptness adopted another national farm program reaffirming the broad and comprehensive powers it had previously given the Secretary of Agriculture to develop agricultural marketing plans for the purpose of raising the income of farmers.[2] The philosophy of this later Act was not competition as in the Sherman Act but governmental price fixing as in the original 1933 Agricultural Adjustment Act, the National Industrial Recovery Act, and a host of other contemporaneous Acts, all of which were designed to raise the income and purchasing power of workers and farmers. Today some 26 years after the *Butler* decision this Court

---

[1] 297 U. S. 1.
[2] 50 Stat. 246, 7 U. S. C. § 601 *et seq.*

again projects itself across the path of the national farm program by reading Congress' 1937 re-enactment as designed to encourage competition rather than to help farmers by governmental price fixing, and on this basis strikes down a vital element of many of the milk marketing orders set up under the 1937 Act while raising clouds of confusion and uncertainty as to the validity of many others. Although the blow to the present farm program is not so devastating as the one inflicted on the original Act by the *Butler* decision, I think that in ultimate effect the harmful consequences of the two decisions will differ only in degree. It is my belief that the order of the Secretary which the Court strikes down was set up in faithful adherence to the Act's purpose to raise the prices that farmers receive for their products and that the Court's action will tend to have precisely the opposite effect of depressing those prices. I have no doubt but that the Court's decision will enable some handlers to reap greater profits but I regret to say that this is bound to be at the expense of the farmers themselves—for whose benefit the national program was primarily passed. Certainly this is true of the more than $700,000 which the Court's decision today will allow the two handlers here to be paid which of necessity must come out of the pockets of the dairy farmers where this milk was sold.

The basic features of the Act under which the Secretary promulgated the regulation which the Court today strikes down were first enacted in 1935 [3] when the dairy industry was near the bottom of its depression and dairy farmers in many parts of the country were not even receiving the actual cost of producing the milk they sold. These 1935 provisions were themselves amendments to the original 1933 Agricultural Adjustment Act, and were designed to spell out more clearly and to some extent add

---

[3] 49 Stat. 750.

to the broad powers which the original 1933 Act had given the Secretary to correct the "severe and increasing disparity between the prices of agricultural and other commodities" by raising "the purchasing power of farmers" and stabilizing the value of the "agricultural assets supporting the national credit structure." [4]

The causes of the low prices to dairy farmers which led Congress to grant these broad powers were, like the details of the operation of the milk business itself, incredibly complex. In the main, however, these low prices were widely attributed to a vicious and destructive competition among dairy farmers for fluid milk sales which brought farmers higher prices than did sales as surplus milk for manufacturing butter, cheese and other milk products.[5] In order to bring an end to this competition which was pushing farmers to the wall, the 1935 Act gave the Secretary specific power to set up regional marketing areas within which he could, for the Government, fix minimum prices handlers would have to pay to farmers for the various uses of milk, require that those minimum prices be paid to a pool for the area and distribute the proceeds of the pool so that each farmer selling milk through the pool would ultimately be paid at the same uniform rate or "blend price" regardless of the use to which his particular milk was put.[6] In the original 1935 Act the Secretary was directed to fix prices at "parity"—a level designed by Congress to insure that farmers generally would receive a higher price for their products than they could get in an open, competitive market.[7] The 1937 reenactment went beyond even this, however, and gave the Secretary power to fix prices above this parity level in order to

---

[4] 48 Stat. 31.

[5] See *Nebbia* v. *New York*, 291 U. S. 502, 515–518, 530; *United States* v. *Rock Royal Co-operative, Inc.*, 307 U. S. 533, 548–550.

[6] 50 Stat. 246, as amended, 7 U. S. C. § 608c.

[7] 49 Stat. 750.

insure that dairy farmers in particular would receive a high enough price for their products.[8]  In order to make sure that the Secretary had enough power to raise prices above the competitive level the Secretary was also authorized to issue orders "Incidental . . . and necessary to effectuate" the specific price-fixing and other powers given to him.[9]  Thus it can be seen that the general scheme of the Act was to raise prices to farmers by governmental fixing of minimum prices for dairy products within specific regional areas, thereby abandoning to that extent the system of price fixing by competition.

In accordance with this general plan and under the authority of the Act, the Secretary has proceeded after full hearings within the various regions to set up a number of regional milk marketing pools, one of which is the New York-Northern New Jersey pool whose operation is jeopardized by the Court's decision today.[10]  The Secretary has also chosen to leave a number of areas unregulated.  Obviously in a system including both large unregulated areas and regulated regional pools in which prices may be fixed at different levels, there will be significant and complicated problems involved in milk sales and purchases that do not take place wholly within a single pool.  Among the most serious of these prob-

---

[8] 50 Stat. 247, 7 U. S. C. § 608c (18).

[9] 49 Stat. 757, 7 U. S. C. § 608c (7)(D).

[10] Congress specifically provided in § 8c (11)(C) of the Act that the Secretary's price-fixing powers were to be exercised on a regional basis rather than a national basis whenever practicable:

"All orders issued under this section which are applicable to the same commodity or product thereof shall, so far as practicable, prescribe such different terms, applicable to different production areas and marketing areas, as the Secretary finds necessary to give due recognition to the differences in production and marketing of such commodity or product in such areas." 49 Stat. 759, 7 U. S. C. § 608c (11)(C). See also § 8c (11)(A). 49 Stat. 759, 7 U. S. C. § 608c (11)(A).

lems is that handlers from outside a pool can, if left unregulated, get the advantages of selling milk in that pool area without bearing any of the burdens that members of that pool have to bear. And as shown by the record in this case such sales can reduce the net price received by the farmers within the pool area. In an obvious effort to prevent any such harmful effects on the prices received by farmers in the New York-Northern New Jersey pool, the Secretary, properly I think, acting under his authority to issue orders "Incidental . . . and necessary to effectuate" his specific price-fixing powers, provided that nonpool handlers who sold fluid milk in that pool area at times when there was surplus fluid milk in the pool should make a payment to compensate pool farmers for the displacement of fluid sales they otherwise would have made, compensate for the reduction of the regional pool fund which this would cause and to compensate for the consequent diminution of the blend price that would be paid to pool farmers. It is this key regulatory feature which the Court strikes down as a "trade barrier" prohibited by § 8c (5)(G) of the Act because it limits the ability of outside handlers to sell milk within the pool area at a profit.

It is no doubt true that the Secretary's requirement that nonpool handlers make compensatory payments in order to sell fluid milk within the New York-Northern New Jersey pool area does limit to some extent the ability of handlers whose major business is outside the pool to dump their surplus milk into the pool at highly profitable fluid milk prices, and if this is a trade barrier the Secretary's regulation can properly be called a "trade barrier." But § 8c (5)(G) says nothing at all about prohibiting "trade barriers" or guaranteeing high profits to handlers, and if it had it would have been at cross purposes with the basic aim of the Act to have government rather than com-

petition fix the minimum prices that farmers in designated regional areas must be paid for their milk. It says only:

"No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or *in any manner limit, in the case of the products of milk,* the marketing in that area of any milk or product thereof produced in any production area in the United States." [11]

This language contains no words or arrangement of words of any kind that would prohibit the Secretary from limiting the marketing of milk in any regional area where necessary to protect the prices fixed for that regional area. The Court, however, goes to great lengths to try to show on the basis of legislative history that Congress really meant the no-limitation clause to apply to milk as well as to milk products. ·In other words the Court wants to read the statute as if Congress had said "No order shall prohibit or limit the marketing in that area of any milk or product thereof." But Congress simply did not say that. And the whole legislative history persuades me that Congress knew exactly what it was saying and that, while it intended to forbid the Secretary from making blanket prohibitions against outside milk, it also meant to leave the Secretary free to establish whatever regulations were necessary to guarantee that farmers in a price-fixing region received the regional prices he was authorized to fix even though those regulations might limit sales by outside handlers by making them unprofitable.[12]

Outside the language of § 8c (5)(G) itself the clearest indication that this is the proper interpretation of the leg-

---

[11] 49 Stat. 755, 7 U. S. C. § 608c (5)(G). (Emphasis supplied.)

[12] See *Bailey Farm Dairy Co.* v. *Anderson,* 157 F. 2d 87, 96; *Kass* v. *Brannan,* 196 F. 2d 791, 800 (L. Hand, J., dissenting).

106

islative history of the Act is that an amendment which would have made the no-limitation clause applicable to milk as well as milk products was defeated on the floor of the House and that an amendment to the same effect which passed the Senate was deleted in Conference.[13]   The arguments of the Chairman of the House Committee on Agriculture, one of the principal architects of the program,

---

[13] The amendment adopted by the Senate but rejected by the Conference is indicated in italics: "No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit *or in any manner limit, except as provided for milk only in subsection (d)*, the marketing in that area of any milk or product thereof produced in any production area in the United States."   79 Cong. Rec. 11655.   The wording of this amendment shows that the Court's attempted explanation of why "in any manner limit" was omitted from the final language of § 8c (5) (G) does not bear analysis.   The Court's explanation is that someone might construe "limit" as prohibiting "the type of price fixing [limitation] covered by subsection (D)."   But it seems very clear that the wording of the Senate amendment was expressly designed to prevent such a construction while at the same time making "in any manner limit" applicable to milk.   Consequently it seems apparent that in rejecting the Senate amendment the Conference was not refusing to apply "in any manner limit" to milk because to do so would interfere with the operation of subsection (D), but was in fact omitting that language because, to be effective, price fixing itself necessarily required limitations on the selling of outside milk within the area.   This is clearly shown by the Conference Report, H. R. Rep. No. 1757, 74th Cong., 1st Sess. 21:

"The Senate amendment extended this provision [§ 8c (5) (G)] so that no marketing agreement or order so applicable could limit in any manner the marketing in the marketing area of milk or its products produced anywhere except that certain limitations on the marketing of milk were specifically permitted. . . .   The conference agreement also denies the authority to limit in any manner the marketing in any area of milk products . . . [but] does not refer to milk, and *so does not negative the applicability to milk*, for use in fluid form or for manufacturing purposes, of the provisions of the bill relating to milk such as *the provisions on price fixing*, price adjustment, payments for milk, etc."   (Emphasis supplied.)

against the amendment in the House show, almost conclusively, a general understanding that regional price fixing necessarily required sales from out of the region to be limited if the price fixing were to be successful:

"Mr. JONES. Mr. Chairman, *the adoption of the amendment of the gentleman from Wisconsin would absolutely wreck the whole milk program. In order to get away from the terrific conditions that have prevailed in the milk industry there is provided in the bill authority to fix a minimum price to producers. That, at least in a measure, would limit or tend to limit shipment,* and yet the gentleman, I am sure, does not want to interfere with the price to producers. Then it is a universal custom in the marketing of milk to classify milk. This, in a way, is a limitation.

"I am perfectly willing to adopt the first amendment suggested [the present § 8c (5)(G)], because that simply treats all areas alike, for you could not prohibit someone from an outside area coming in so long as he complied with the conditions prescribed for that area; *but if you said that no restrictions or limitations could be required, it would wreck the program, it would destroy every vestige of a program we have for milk.*" [14]

After the Senate amendment had been rejected by the Conference and while the Conference Report was being considered in the House of Representatives, a discussion took place on the floor between Representative Hope, a member of the House Committee on Agriculture and one of the conferees, and the Chairman of the Committee who was also a conferee. This discussion shows the same understanding that the Secretary was to be left free to

---

[14] 79 Cong. Rec. 9572. (Emphasis supplied.)

impose whatever limitations were necessary to protect the regional prices he was authorized to fix:

"Mr. JONES. But the original amendments did not permit any orders governing the price to the producers?

"Mr. HOPE. No; but otherwise the Secretary could make orders which would regulate the bringing in of milk from the outside into any particular milkshed, but under the amendments we are now considering the Secretary's power is limited. He cannot prohibit milk from coming in?

"Mr. JONES. That is correct.

"Mr. HOPE. *But he can prescribe some limitations?*

"Mr. JONES. *Yes; and he cannot prohibit the products of milk being brought into any area.*

"Mr. HOPE. *No; but he can prescribe limitations on the importation of fluid milk.*

"Mr. SNELL. *Then, as far as fluid milk is concerned, it is protected in certain markets,* but, as far as the other products are concerned, they are not protected.

"Mr. JONES. That is correct." [15]

These were the last comments made on the floor of the House concerning milk before the Conference Report was finally adopted.

In the light of this legislative history and the Act's language itself, I cannot possibly read § 8c (5)(G) or any other part of the Act to insure profitable operations to outside handlers who desire to dump surplus milk into a regional price-fixing area or to say that the Secretary lacks the power to protect by appropriate regulations the integrity of the regional prices which Congress authorized him to fix. I simply cannot believe that Congress intended to

---

[15] 79 Cong. Rec. 13022. (Emphasis supplied.)

take away with one hand the high fixed price for milk which it gave with the other.

The net result of the Court's action is to leave the farmers in the New York-Northern New Jersey pool, and those in 22 other pools containing the provisions which the Court strikes down today,[16] completely defenseless against an onslaught of outside milk that is highly discriminatory because the outside milk bears none of the burdens of pool milk. I say completely defenseless despite the fact that the Court intimates that the Secretary might possibly devise some alternative compensatory payment plan that would satisfy the exacting standards which it lays down today. My first reason for saying this is that I do not see how any formula that the Secretary could devise under the Court's expanded interpretation of the word "prohibit" in § 8c (5)(G) would protect pool members from unfair competition by outside handlers who are by the Court's decision given the advantages but not required to bear the burdens of the pool.[17]

---

[16] See note 9 of the Court's opinion. At least 18 other pools apply a compensatory payment provision like the one in this case for at least part of the year. See note 13 of the Court's opinion.

[17] Certainly neither of the formulas which the Court in its note 13 intimates might be proper would protect the farmers in the pool, for neither of these formulas even goes so far as to wipe out the discriminatory advantage that unregulated outside milk has over pool milk. In sustaining the Secretary's regulation in this case the Judicial Officer relied in part on the following reasons:

"[T]he marketwide pool existing under Order No. 27, as amended, carries the long-time and seasonal reserves of milk for numerous secondary markets in Pennsylvania and the Northeastern States. The New York-New Jersey market carries the surplus burden for outside handlers who distribute some milk in the marketing area. These handlers usually have a relatively high percentage of their milk in fluid milk utilization and this utilization is considerably higher than the average for the market regulated by Order No. 27. This higher utilization, of course, results in a competitive advantage in milk procurement to the outside handler as against the regulated handler and

Secondly, even if such a formula were possible I doubt that a single member of this Court has the technical knowledge about the complicated workings of the milk industry to formulate a sound substitute for the compensatory payment plan which the Court strikes down—a regulatory plan which represents more than a quarter century of daily practical experience in administering the congressional farm plan. Thirdly, in any event the Court's vague intimations that some compensatory payment plan might be valid are hardly sufficient to furnish the Secretary with any guidance at all as to what formula if any the Court would permit him to use to protect the farmers in this pool from the effects of being compelled to compete with outside "free riders."

I think that if the Court really does believe that the Secretary has any power at all to prevent pool farmers from being subjected to discriminatory competition from outside "free riders" it should state in clear and precise

---

outside and regulated handlers draw on the same production area for supplies. Furthermore, the regulated handler has to equalize his utilization with other handlers and his producers are paid on the basis of a uniform price reflecting the utilization in the market as a whole rather than his individual utilization."

Thus, a compensatory payment, such as the Court suggests, based on the difference between the fluid price and the blend price obviously would do nothing at all to wipe out the advantage that the outside handler has because of his higher fluid-surplus ratio which is due, as shown above, to (1) the fact that the pool carries part of his area's surplus and (2) the fact that he does not have to equalize his own utilization as do pool handlers. Only a compensatory payment which gives the outside handler less for his surplus milk than the pool farmer gets will narrow the competitive advantage which outside milk has. A compensatory payment based on the difference between the fluid price and actual cost, the other alternative suggested by the Court, would obviously be even more subject to this same defect than the fluid-blend price compensatory payment. See also Hutt, Restrictions on the Free Movement of Fluid Milk Under Federal Milk Marketing Orders, 37 U. Det. L. J. 525, 573–576, particularly at note 220.

terms what those powers are and inform the Secretary how he can meet this Court's requirements. The Court should then remand this case to allow the Secretary to take the action which it will approve, permit him to determine the amount that he could properly under its standards have required these handlers to pay and direct that the District Court pay over that amount to the Secretary out of the funds now in its possession. This plan would at least offer the farmers in this pool some protection against having to pay out all of the more than $700,000 in compensatory payments which has already been collected from these handlers. Such a plan was followed in *United States* v. *Morgan*,[18] and there is every reason in equity and good conscience why it should be followed here. In that case the District Court enjoined an order of the Secretary but required the party challenging the order to pay into court sufficient funds to effect compliance with the order if it should ultimately be found valid. This Court found the order defective but nevertheless ordered the District Court not to return the fund, which then contained over a half million dollars. On the contrary, over strong dissents urging that the Secretary only had power to issue a new order for the future, this Court commanded that the fund be retained until the Secretary could make new findings and enter a new order so that the fund could be disposed of under a proper determination of the Secretary, stating that:

> "Due regard for the discharge of the court's own responsibility to the litigants and to the public and the appropriate exercise of its discretion in such manner as to effectuate the policy of the Act and facilitate administration of the system which it has set up, require retention of the fund by the district court

---

[18] 307 U. S. 183.   Cf. *Inland Steel Co.* v. *United States*, 306 U. S. 153.

until such time as the Secretary, proceeding with due expedition, shall have entered a final order in the proceedings pending before him." [19]

Following this decision the Secretary held new hearings, made new findings and entered a new order, according to which this Court in a later *United States* v. *Morgan* [20] ordered the more than one-half-million-dollar fund distributed.

Despite the fact that the Court purports not to pass either on the validity of requiring all handlers to bear the full burdens of pool membership or upon the ability of the Secretary to apply against these handlers any future scheme of regulation which meets the Court's standards for the period here in question, [21] it seems clear that in failing to follow the *Morgan* procedure the Court in effect rules against the Secretary on both these questions. This is because the Court's refusal to pass specifically on these questions leaves standing the District Court's holding that the Secretary cannot require these handlers to bear the full burdens of pool membership for the period during which the compensatory payments struck down here were made. The regulation under which the Secretary claims that these handlers are subject to the full burdens of pool membership is a part of the same section [22] as the one under which the handlers made the compensatory payments of which they com-

---

[19] 307 U. S., at 198.

[20] 313 U. S. 409.

[21] The Court's citation of *Morgan* v. *United States*, 304 U. S. 1, 23, as purported justification for its avoidance of this issue is particularly appropriate, and I fear prophetic. For in large part due to this Court's avoidance of a similar issue in the *Morgan* case, that case wandered through the courts for almost eight years, including four trips to this Court.

[22] 7 CFR § 1002.29 (d).

plain. That section provides that all handlers like petitioners are pool handlers and required to bear all the burdens of pool membership unless they elect to be non-pool handlers and make compensatory payments. The Secretary's contention is that once the part of the regulation which provides for the compensatory payment is struck down, as the Court does here, the remainder of the regulation which requires all handlers to be pool handlers applies. By remanding this case to the District Court which has already ruled adversely on this claim the Court without so much as saying a single word on this point effectively prevents the Secretary from trying to protect pool farmers from free-riding outside milk by treating these handlers as pool members for the period here in dispute.

The full effect of the Court's failure to follow the *Morgan* procedure and decide whether the Secretary's provisions for full regulation of these handlers are valid, or just what the Secretary could do to protect the prices he has fixed, is in my opinion likely to be a wholly unjust and inequitable windfall of over $700,000 to the handlers, since it will ultimately have to come out of the pockets of the farmers who bear the burdens of this pool. How many more such windfalls to other handlers involving how many countless thousands of dollars in this and the other 22 similarly situated pools the Court's action will bring one can only guess.[23] One familiar with the Act and its history need not guess, however, about the fact that such a result would have been abhorrent to the Congress which passed this Act for the benefit of farmers. I would affirm the decision of the court below which upheld the Secretary.

[23] A suit involving the provision of the Cleveland order similar to the one struck down here has already found its way into court. See *Lawson Milk Co.* v. *Benson*, 187 F. Supp. 66, appeal pending.